UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK FORD, | ) | CIVIL ACTION NO. 4:21-CV-1957 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| TYLER SMITH, *et al.*, | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Mark Ford ("Plaintiff") is a state inmate presently confined in Mahanoy State Correctional Institution ("SCI Mahanoy"). He initiated this civil rights action alleging, among other things, that several members of the SCI Mahanoy staff have retaliated against him because he accused one staff member (C/O Smith) of sexual harassment. Although several of Plaintiff's claims were dismissed, some of Plaintiff's claims against three Defendants (C/O Smith, C/O Powell, and Hearing Examiner Wiederhold) remain pending.

Currently before the Court is Defendants' Motion for Summary Judgment. (Doc. 39). In their Motion, the remaining three Defendants argue summary judgment should be entered for all remaining claims against them. After considering the parties' briefs, statements of material fact, and exhibits, we will grant Defendants' Motion for Summary Judgment in part. Defendants' Motion for Summary Judgment will be granted as to Plaintiff's claims of retaliatory denial of

food against C/O Smith, and retaliatory discipline against C/O Powell and Hearing Examiner Wiederhold.

Although we were not persuaded by Defendants' arguments that summary judgment should be entered as to Plaintiff's claims of retaliatory verbal harassment against C/O Smith or retaliatory discipline against C/O Smith, we have concluded based on this record that it should be entered in Defendants' favor for reasons not raised by either party pursuant to Rule 56(f). The parties will be given an opportunity to respond to our reasoning, and if necessary, to supplement the summary judgment record as to these two claims before final judgment is entered.

## II.      BACKGROUND AND PROCEDURAL HISTORY[1]

We will summarize the relevant factual background and procedural history in this case. That relevant factual background includes a discussion of Plaintiff's PREA Complaint and the resulting misconduct charge, Plaintiff's grievances alleging retaliatory verbal and non-verbal harassment by C/O Smith, a rule violation charge issued by C/O Smith, and Plaintiff's allegations regarding the retaliatory denial of a food tray.

---

[1] This background is, in large part, taken from Defendants' statement of material facts and their exhibits. Although Plaintiff filed a response to Defendants' statement he did not cite to evidence (exhibits) to support the facts he denies. *See* L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements."). However, because Plaintiff is proceeding pro se, we will independently review the record and evaluate Plaintiff's assertions.

## A.   PLAINTIFF'S PREA COMPLAINT AND MISCONDUCT NO. D 362281

In June 2020, Plaintiff filed a PREA complaint against C/O Smith that was later deemed "unfounded." Plaintiff was then charged with lying to an employee because he filed an "unfounded" PREA complaint. The retaliation claims against C/O Smith, C/O Powell, and Hearing Examiner Wiederhold all cite to this PREA complaint as the "protected activity" that provoked the retaliatory conduct at issue. Below, we will summarize the PREA Complaint and related administrative proceedings.

### 1.   June 3, 2020: Date of Alleged Sexual Harassment by C/O Smith

On June 3, 2020, Plaintiff was naked and housed in psychiatric observation cell H/B 12 after reporting thoughts of self-harm.[2] While there, he had an interaction with C/O Smith that lasted approximately ten seconds. (Pod Camera Video at 12:49:12-12:49:22, Doc. 43). C/O Smith's back was to the pod camera for the entire interaction. *Id.*

For the first five seconds, C/O Randall was a short distance away, or was walking towards C/O Smith. *Id.* For the second five seconds, C/O Randall was standing next to C/O Smith. *Id.* After the interaction between C/O Smith and Plaintiff concluded, C/O Randall remained by Plaintiff's door, and they continued

---

[2] Plaintiff was given a suicide smock but chose not to wear it because it irritated his skin. (PREA Investigation Report, Doc. 40-18, p. 19); (PREA Case Data, Doc. 40-18, p. 2).

to speak. (Pod Camera Video at 12:49:22-12:49:58, Doc. 43). Plaintiff and the Corrections Officers have very different recollections of that interaction.

Plaintiff alleges that C/O Smith sexually harassed him by saying "if I had to walk around with a dick like that I'd want to kill myself too." (Grievance No. 872182, Doc. 40-4, p. 2); (Inmate Statement of Sexual Harassment, Doc. 40-18 p. 5).

C/O Smith recalls that Plaintiff asked C/O Smith to get Plaintiff's clothing. (Smith's Written Statement, Doc. 40-18 p. 9). He denies making any inappropriate remarks about Plaintiff but claimed that Plaintiff threatened to file a PREA complaint if C/O Smith refused to bring his clothes. *Id.*; (DC-17X Form, Doc. 40-21 p. 2). Similarly, C/O Randall denied that he or C/O Smith said anything sexual or derogatory to Plaintiff during that interaction. (Randall's Written Statement, Doc. 40-18 p. 6). Two other Corrections Officers (Greenzweig and Webb) working in the same area both stated that Plaintiff did not verbally report any harassment, C/O Greenzweig stated that he did not hear C/O Smith use any negative or derogatory language. (Greenzweig and Webb's Written Statements, Doc. 40-18 pp. 7-8).

### 2. June 6, 2020: Initial Report of Sexual Harassment in Grievance No. 872182

On June 6, 2020, Plaintiff filed a grievance to report the alleged sexual harassment by C/O Smith that occurred three days earlier under the Inmate Grievance Policy (DC-ADM 804). (Defendants' SOF, Doc. 41 ¶ 18); (Plaintiff's Response, Doc. 50 ¶ 18) (admitting Doc. 41 ¶ 18); (Grievance No. 872182, Doc. 40-4 p. 2).

On June 9, 2020, the facility grievance coordinator (J. Mahally) rejected Plaintiff's grievance and responded that his allegation would be handled through a PREA investigation. (Defendants' SOF, Doc. 41 ¶ 19) (stating that Grievance No. 872182 was handled as a PREA complaint); (Plaintiff's Response, Doc. 50 ¶ 19) (admitting Doc. 41 ¶ 19); (Grievance No. 872182 Rejection, Doc. 40-4 p. 4).

### 3. PREA Investigation

On June 10, 2020, a PREA investigation was opened by the SCI Mahanoy Security Office. (PREA Case Data, Doc. 40-18 p. 2).

The State Police were notified of the PREA investigation. (PSP Investigation Determination, Doc. 40-18 p. 10). Trooper Tray investigated. *Id.* On June 12, 2020, Trooper Tray determined that the incident was unsubstantiated, that there was no evidence to support Plaintiff's allegation, and closed the investigation. *Id.*

Lieutenant Briscoe conducted the Department of Corrections' Investigation. Lieutenant Briscoe interviewed Plaintiff, C/O Smith, and three staff witnesses

(Randall, Greenzweig, and Webb). (Defendants' SOF, Doc. 41 ¶¶ 20-21); (Plaintiff's Response, Doc. 50 ¶¶ 20-21) (admitting that Lieutenant Briscoe was assigned to investigate); (Inmate and Staff Written Statements, Doc. 40-18 pp. 5-9). He preserved and viewed the video footage. (Shift Commander Checklist, Doc. 40-18 p. 13); (Investigative Summary, Doc. 40-18 p. 15). He reviewed prior PREA complaints filed by Plaintiff. (Investigative Summary, Doc. 40-18 p. 15). On June 29, 2020, he completed his written investigative summary, and attached relevant evidence to it. (Defendants' SOF, Doc. 41 ¶ 21); (Plaintiff's Response, Doc. 50 ¶ 21) (admitting Lieutenant Briscoe completed an Investigative Summary); (Investigative Summary, Doc. 40-18 pp. 14-20).

DC-ADM 008 § 18(C)(9)(b)(2) requires that, when completing an investigative summary, the investigator must indicate a conclusion of whether the evidence supports a finding that sexual abuse or harassment has occurred. (DC-ADM 008, Doc. 40-17 p. 11). The investigator may determine that the allegation is: (1) substantiated; (2) unsubstantiated; or (3) unfounded. *Id.* An allegation is "substantiated" where it "was investigated and determined to have occurred." (DC-ADM 008 Glossary, Doc. 40-17 p. 18). An allegation is "unsubstantiated" if it "was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred." *Id.* An allegation is "unfounded" if it "was investigated and determined not to have occurred." *Id.*

A report of sexual abuse made in good faith that is found to be "unsubstantiated" cannot constitute "falsely reporting an incident" or "lying" for the purposes of inmate discipline. (DC ADM-008 § 17(C)(6), Doc. 40-17 p. 3); (Defendants' SOF, Doc. 41 ¶ 25); (Plaintiff's Response, Doc. 50 ¶ 25) (admitting Doc. 41 ¶ 25). An inmate who reports sexual abuse that has been determined to be "unfounded," however, "shall be subject to disciplinary action." (DC ADM-008 § 17(C)(8), Doc. 40-17 p. 3); (Defendants' SOF, Doc. 41 ¶ 25); (Plaintiff's Response, Doc. 50 ¶ 25) (admitting Doc. 41 ¶ 25).

At the end of his investigative summary, Lieutenant Briscoe concluded that Plaintiff's allegations were unsubstantiated, and recommended that the investigation be closed. (Investigative Summary, Doc. 40-18 p. 18).

Captain Dunkle reviewed and approved Lieutenant Briscoe's Investigative Summary. (Defendants' SOF, Doc. 41 ¶ 22); (Plaintiff's Response, Doc. 50 ¶ 22) (admitting Doc. 41 ¶ 22);  (Investigative Summary, Doc. 40-18 p. 1).

On July 1, 2020, the Investigative Summary was sent to the Bureau of Investigations and Intelligence ("BII") for review and approval. (Investigative Summary, Doc. 40-18 p. 14).

Special Investigator Tokach reviewed the investigation. (BII Closing Memo, Doc. 40-19). On August 18, 2020, the BII informed Superintendent Mason that it did not agree with Lieutenant Briscoe's conclusion that Plaintiff's allegations were

unsubstantiated. (Defendants' SOF, Doc. 41 ¶ 24); (Plaintiff's Response, Doc. 50 ¶ 24) (admitting this was the conclusion reached but denying that it was a correct conclusion); (BII Closing Memo, Doc. 40-19). Rather, it determined the allegations were unfounded. (Defendants' SOF, Doc. 41 ¶ 24); (Plaintiff's Response, Doc. 50 ¶ 24) (admitting this was the conclusion reached but denying that it was a correct conclusion); (BII Closing Memo, Doc. 40-19).

### 4.    Misconduct No. D 362281: Lying to an Employee

On August 20, 2020, Captain Dunkle issued Misconduct No. D 362281 charging Plaintiff with a B Class 1 offense of lying to an employee. (Defendants' SOF, Doc. 41 ¶¶ 37-39); (Plaintiff's Response, Doc. 50 ¶¶ 37-39) (admitting Doc. 41 ¶¶ 37-39); (Misconduct No. D 362281, Doc. 40-20, p. 1).[3] In the "staff members version," Captain Dunkle wrote that Plaintiff alleged "CO Smith stared into his cell (H/B12) while he was naked and stated 'if I had to walk around with a dick like that, I'd want to kill myself too,'" and noted that a PREA investigation was completed and BII submitted a closing memo indicating the allegation was unfounded. (Misconduct No. D 362281, Doc. 40-20 p. 1).

Per DOC Policy DC-ADM 801 § 1(B)(4) a misconduct charge "shall be investigated as required, reviewed, and approved by the Shift Commander, prior to service . . . on the inmate. (Defendants' SOF, Doc. 41 ¶ 41); (Plaintiff's Response,

---

[3] The misconduct report was written by Captain Dunkle because Lieutenant Briscoe was on long term leave.

Doc. 50 ¶ 41) (admitting Doc. 41 ¶ 41); (DC-ADM 801, Doc. 40-22 p. 9). C/O Powell was the ranking Corrections Officer on duty that day. (Defendants' SOF, Doc. 41 ¶¶ 42-47); (Plaintiff's Response, Doc. 50 ¶¶ 42-47) (admitting that Powell was the shift commander that day). He reviewed Misconduct No. D 362281 and concluded that Captain Dunkle's version of events supported the charge of lying to an employee, that there were no errors, and that the dates were correct. (Defendants' SOF, Doc. 41 ¶¶ 42-47); (Plaintiff's Response, Doc. 50 ¶¶ 42-47) (disputing Powell reviewed the misconduct but citing no evidence to support this position). C/O Powell found that the charged violation was appropriate. (Defendants' SOF, Doc. 41 ¶¶ 42-47); (Plaintiff's Response, Doc. 50 ¶¶ 42-47) (disputing Powell made any independent determination about the charges but citing no evidence to support this position). He also researched Plaintiff's mental health status and determined that the charges in Misconduct No. D 362281 were not appropriate for informal resolution. (Defendants' SOF, Doc. 41 ¶¶ 42-47); (Plaintiff's Response, Doc. 50 ¶¶ 42-47) (admitting this fact).

### 5. Hearing and Administrative Appeals of Misconduct No. D. 362281

On August 24, 2020, Hearing Examiner Wiederhold presided over Plaintiff's misconduct hearing. (Defendants' SOF, Doc. 41 ¶ 48); (Plaintiff's Response, Doc. 50 ¶ 48) (admitting this fact); (Disciplinary Hearing Report, Doc. 40-24 p. 1). Plaintiff pleaded not guilty and provided written and oral statements in his defense.

Plaintiff argued that the misconduct was issued in retaliation for filing a PREA

complaint against C/O Smith and denied that he lied. (Disciplinary Hearing Report,

Doc. 40-24 p. 1). In his written statement, Plaintiff asserted that:

1)      The word 'unfounded' does not mean that I lied about anything.
        The word 'unfounded' just means not supported. In other
        words, I need more than just my word against the c/o's for the
        PREA complaint to go forward. Simply because more proof is
        necessary does not mean that I am lying. It only means that Lt.
        Briscoe (c/o Smith's buddy) chose to take c/o Smith's word
        over mine.

2)      The proof that I offer is camera footage. While it is true that the
        camera does not record audio; it is true that the footage will
        verify that c/o Smith was at the cell door twice (between the
        hours of (9:15AM. And 13:45 PM.). The camera would have
        also recorded his mouth moving, his facial expressions, and
        hand gestures while he stood in front of the POC. cell.

3)      Most importantly, issuing a misconduct because of the filing of
        a PREA complaint violates the PREA directive; because I am
        being punished (retaliated against) for the filing of a PREA
        complaint. This is strictly forbidden by the PREA directives.
        See: DC-ADM-008. There is also a federal PREA mandated
        that is violated when the PREA victim is retaliated against.

(Inmate's Version, Doc. 40-24).

        Hearing Examiner Wiederhold reviewed the Investigatory Summary Report

concluding that Plaintiff's allegations were "unsubstantiated," reviewed the BII

closing memo, and determined that the witness statements in the Investigatory

Summary that C/O Smith said nothing derogatory to Plaintiff was more credible

than Plaintiff's testimony that he did not lie. (Defendants' SOF, Doc. 41 ¶ 49);

(Plaintiff's Response, Doc. 50 ¶ 49) (admitting that this was the result, but

disputing the decision was fair without citing to any evidence); (Disciplinary Hearing Report, Doc. 40-24 pp. 1-2). He concluded that a preponderance of the evidence supported the charge, and sentenced Plaintiff to 30 days of DC. (Defendants' SOF, Doc. 41 ¶ 49); (Plaintiff's Response, Doc. 50 ¶ 49) (admitting that this was the result, but disputing the decision was fair without citing to any evidence); (Disciplinary Hearing Report, Doc. 40-24 pp. 1-2).

Plaintiff appealed the misconduct charge, but it was upheld at every level. (Defendants' SOF, Doc. 41 ¶ 50); (Plaintiff's Response, Doc. 50 ¶ 50) (admitting this fact).

### B.   RETALIATORY HARASSMENT BY C/O SMITH

Plaintiff alleges that C/O Smith verbally harassed him to retaliate against Plaintiff for accusing Smith of sexual harassment.

Plaintiff describes a combination of verbal and non-verbal harassment in two grievances: (1) an unnumbered grievance construed as the appeal of Grievance No. 827182 (Plaintiff's PREA Complaint), filed on June 19, 2020, (Unnumbered Grievance, Doc. 40-4 pp. 5-6); and (2) Grievance No. 878355, dated July 13, 2020, (Grievance No. 878355, Doc. 40-6 p. 2). Plaintiff mentions non-verbal harassment by way of a "death stare" in Grievance No. 899121, filed on November 10, 2020, (Doc. 40-26). Plaintiff's claims in his Amended Complaint, are limited to verbal harassment. He does not allege a claim that C/O Smith retaliated against him by

way of "death stare." We will nonetheless summarize all three grievances, as the "death stare" could be considered as part of a pattern of antagonism.

### 1. Grievance No. 827182 (Describing Retaliatory Verbal Harassment and Retaliatory Death Stare)

On June 9, 2020, Grievance No. 827182 was rejected and forwarded to the Security Office for Investigation. (Grievance No. 872182 Rejection, Doc. 40-4 p. 4). Ten days later, on June 19, 2020, Plaintiff submitted a written inmate grievance to the facility grievance coordinator "in regard[] to grievance number 872182." (Unnumbered Grievance, Doc. 40-4 p. 5). In that document, Plaintiff alleged that on June 19, 2020, C/O Smith noticed Plaintiff walking towards the dining hall and said "Yo [Plaintiff] keep f[***]ing walking a[**]hole." *Id.* Then, as Plaintiff exited the dining hall, C/O Smith looked at Plaintiff in a "vicious and intimidating manner." *Id.* This document was treated as an appeal of Grievance No. 827182, and the rejection of that grievance was upheld by the facility manager on July 6, 2020. (Facility Manager's Appeal Response, Doc. 40-4 p. 7). Plaintiff raised the same concerns in his final appeal of Grievance No. 872182. (Inmate Appeal to Final Review, Doc. 40-4 p. 8) ("I then filed a second grievance for retaliation because on 6.19.20 C/O Smith left his post inside of the dining hall three, came outside as he noticed me walking past and said to me "yo . . . keep f[***]ing walking a[**]hole."). On August 25, 2020, the Chief Grievance Officer determined that Grievance No. 872182 was properly rejected. (Final Appeal Decision

Dismissal, Doc. 40-4 p. 1). Plaintiff's allegations related to the June 19, 2020 incident were not discussed in the PREA investigative summary.

### 2. Grievance No. 878355 (Describing Verbal Harassment and Vicious Staring)

On July 13, 2020, Plaintiff filed Grievance No. 878355 alleging that on July 11, 2020, C/O Smith "viciously stared" at him and stated, "only p[***]ys file grievances," then turned to another inmate and said, "I have some money for you to take care of a p[***]y ni[**]a for me." (Grievance No. 878355, Doc. 40-6 p. 2); (Defendants' SOF, Doc. 41 ¶ 60); (Plaintiff's Response, Doc. 50 ¶ 60) (admitting this fact).

On July 24, 2020, the facility grievance coordinator denied the grievance, and responded that:

> I have reviewed your grievance dated 7/13/2020, where in you indicate Officer Smith viciously starred at you and stated "only p[***]ys file grievances" and offered another inmate money to "take care of a p[***]y nigga for me" as you exited the Yard on July 11th.

> I interviewed Officer Smith regarding these allegations, and he denied making these threatening statements. His job is to monitor inmate activity/movement during recreational periods. Furthermore, I'm not sure how you perceived him to be "viciously starring [sic] at you with the look of death" since he was wearing sunglasses.

> Based on my investigation, I find no evidence to support your claim of harassment or intimidation.

> Based on the above information, I consider this grievance to be without merit with no further action necessary. The relief and compensation you seek is denied.

(Grievance No. 878355 Initial Review Response, Doc. 40-6 p. 3).

On July 28, 2020, Plaintiff appealed Grievance No. 878355 to the facility manager. (Grievance No. 878355 Appeal to Facility Manager, Doc. 40-6 p. 4). He repeats the same allegations regarding C/O Smith's conduct. *Id.*

On August 21, 2020, the facility manager upheld the grievance coordinator's response. (Grievance No. 878355  Facility Manager Appeal Response, Doc. 40-6 p. 5). The facility manager explained:

> Upon review of all information, I find that [the facility grievance coordinator] properly investigated your claims and provided you with an appropriate response. Officer Smith denies all allegations made and there is no evidence to substantiate your claims.

*Id.* Plaintiff claims on August 31, 2020, he received the response. (Grievance No. 878355 Final Appeal, Doc. 40-6 p. 6).

On September 11, 2020, Plaintiff filed a final appeal of Grievance No. 878355. *Id.* On November 3, 2020, the chief grievance officer upheld the facility manager's response. (Grievance No. 878355 Final Appeal Response, Doc. 40-6 p. 1). The chief grievance officer explained:

> This office finds the responses provided to you appropriately addressed your concerns. Despite your claims, records reflect that no evidence was found to suggest that Officer Smith made the comments you indicate he did. Records reflect that Officer Smith was interviewed and denied viciously starring [sic] at you or making such comments. You provide no further information to support your claims either. Therefore, this office upholds the responses provided to you and your requested relief is denied.

*Id.*

### 3.    Grievance No. 899121 (Describing Retaliatory Death Stare)

On November 10, 2020, Plaintiff filed Grievance No. 899121 alleging that on November 8, 2020, C/O Smith viciously stared at him. (Grievance No. 899121, Doc. 40-26 p. 10). Plaintiff wrote:

> On November 8, 2020, while returning from my visit, visit ending at 2:45pm, [C/O Smith] viciously starred [sic] at me so much that if looks could kill I'd be dead. Clearly and obviously in retaliation to grievances 872182 and 878355 [C/O Smith] continues to harass and officially oppress me to prove that he is above SCI-Mahanoy. I continuously express my fear for retaliation from C/O Smith and I also fear for my safety knowing he is around.

*Id.*

On November 16, 2020, the facility grievance coordinator rejected Grievance No. 899121. She explained that Plaintiff did not "indicate that [he was] personally affected by a department or facility action or policy." (Grievance No. 899121 Rejection, Doc. 40-26 p. 9). Nothing in the summary judgment record suggests Plaintiff appealed the rejection or refiled the grievance. (Grievance Summary History, Doc. 40-3 p. 1) (noting the "status" of this Grievance as "1st rejection"). In his Amended Complaint, Plaintiff does not allege any retaliation claim related to the death stare. (*See generally* Doc. 19).

### C.     Rule Violation Charge No. D 074825

Plaintiff alleges that C/O Smith issued a false report accusing Plaintiff of misconduct to punish Plaintiff for accusing Smith of sexual harassment. (Amended Complaint, Doc. 19 ¶ 41).

The summary judgment record includes one DC-141 form by C/O Smith issued to Plaintiff on August 15, 2021. (DC-141 Part 1 D 074825, Doc. 49-2). That form, assigned Number D 074825, charges Plaintiff with using abusive or inappropriate language, refusing to obey an order, and being present in an unauthorized area. *Id*. The box for "misconduct report" is not checked, and instead it is marked "DC-ADM 801 Informal Resolution." *Id*.[4] The charges are identified as a class one misconduct. *Id.* C/O Smith provided the following account:

> On the above date and approx. time, this reporting officer observed [Plaintiff] walk into the BB laundry room. [Plaintiff] is not an authorized laundry worker. I gave [Plaintiff] a direct order to leave the laundry room, which he disregarded. I again gave him a direct order to remove himself from the laundry room, which he did this time at his leisure. I then asked him if he had authorization to be in the laundry room, but he ignored me. I once against asked him if he was authorized to be in the laundry room. [Plaintiff] finally responded, "I don't have to answer a F[***]ing thing you ask me; I'll do whatever I want." He then continued to stand at the laundry room door before returning back to his cell.

*Id.* The report was reviewed and approved by Lieutenant White. *Id.*

_____

[4] DC-ADM 801 provides that "[e]very rule violation is to be reported via a **DC-141, Part 1, Misconduct Report**, and that each violation of the rules "shall be reported and disposed of either by an informal or formal process." (DC-ADM 801 §1(A)(1) and (B), Doc. 40-22, pp. 8-9).

This rule violation was recommended for, and resolved through, the informal resolution process. *Id*.[5] Documents related to that process were not made part of the summary judgment record.

### D. RETALIATORY DENIAL OF FOOD TRAY

Plaintiff alleges that C/O Smith retaliated against him for accusing Smith of sexual harassment with withholding food while Plaintiff was in the RHU "whenever he worked the unit." (Amended Complaint, Doc. 19 ¶ 35).

Plaintiff did not file any grievance against C/O Smith related to the denial of a food tray between the date the PREA complaint was filed and the date he filed

---

[5] On August 17, 2021, Plaintiff filed written Grievance No. 941230 with the facility grievance coordinator. In Grievance No. 941230, Plaintiff wrote:

> On the morning of August 15, 2021, [C/O Smith] yelled at me stating "yo D[**]khead are you authorized to be over there" I ignored [C/O Smith] and he then stated, "D[**]head . . . I am talking to you" I continued to ignore [C/O Smith], receive my bottle of disinfect and proceed to my cell. Camera footage at approx. 7:45am will prove the above stated facts. This is clearly in retaliation to grievance(s) 872182 and 878355. Furthermore, [C/O Smith] lacks training, he's unfit to work on an RHU and as a result of his statements I've experienced a high level of paranoia and anxiety and as previously expressed I fear for my life and safety when [C/O Smith] is present. I am seeking a separation by way of transfer and $25,000 in actual compensation for the continuous harassment, retaliation and future legal fees.

(Grievance No. 941230, Doc. 49-3).

The summary judgment record does not include any written response from the facility grievance coordinator. A grievance chart Defendants provided suggests that Grievance No. 941230 was withdrawn. (Grievance Summary History, Doc. 40-3, p. 1). Plaintiff's allegations in the Amended Complaint regarding this incident are limited to issuing a misconduct. (Amended Complaint, Doc. 19, ¶ 41).

this lawsuit. (Defendants' SOF, Doc. 41 ¶¶ 56, 59); (Plaintiff's Response, Doc. 50 ¶¶ 56, 59) (admitting Doc. 41 ¶¶ 56, 59).

### E. PROCEDURAL HISTORY IN THIS CASE

On November 17, 2021, Plaintiff lodged a Complaint, pending the disposition of his accompanying motion requesting leave to proceed without the prepayment of fees. (Docs. 1, 2). On November 22, 2021, Plaintiff was granted leave to proceed without the prepayment of fees, his Complaint was deemed filed, and Defendants were sent a copy of the Complaint, notice of lawsuit, and a request to waive service of summons. (Doc. 6). Defendants waived service. (Docs. 7, 10).

On January 20, 2022, Defendants filed a Motion to Dismiss. (Doc. 13). Along with their Motion, Defendants filed a supporting brief. (Doc. 14).

In response to Defendants' Motion, and after seeking and being granted additional time, on March 18, 2022, Plaintiff filed an Amended Complaint. (Doc. 19). Defendants' Motion to Dismiss was deemed moot based on the Amended Complaint. (Doc. 22).

On March 23, 2022, Defendants filed a Second Motion to Dismiss. (Doc. 20). Along with their Motion, Defendants filed a supporting brief. (Doc. 21). After being granted an extension of time to respond *sua sponte*, Plaintiff filed his Brief in Opposition. (Doc. 24). On December 27, 2022, Defendants' Motion to Dismiss was granted in part and denied in part. (Docs. 26, 27). Retaliation claims against

three Defendants (C/O Smith, C/O Powell, and Hearing Examiner Wiederhold) were permitted to proceed. Those retaliation claims include:

(1)   A § 1983 claim of First Amendment retaliatory denial of food against C/O Smith;

(2)   A § 1983 claim of First Amendment retaliatory verbal harassment against C/O Smith;

(3)   A § 1983 claim of First Amendment retaliatory discipline by C/O Smith;

(4)    A § 1983 claim of First Amendment retaliatory discipline against C/O Powell; and

(5)    A § 1983 claim of First Amendment retaliatory discipline against Hearing Examiner Wiederhold.

As relief, Plaintiff requests compensatory and punitive damages.

On January 5, 2023, the remaining Defendants filed their Answer. (Doc. 28). A Case Management Order setting pretrial deadlines was issued, and the parties engaged in discovery. (Doc. 29).

On August 2, 2023, Defendants filed a Motion for Summary Judgment. Along with their Motion, Defendants filed a Brief in Support, Statement of Material Facts, over three hundred pages of exhibits, and one disc that contains three videos captured on June 3, 2020. (Docs. 39, 40, 41, 43).

After requesting, and being granted, additional time to respond, on January 5, 2024, Plaintiff filed a Brief in Opposition, responsive Statement of Material Facts, and 27 pages of exhibits. (Docs. 49, 50).

Defendants did not submit a reply brief.

III.    **LEGAL STANDARDS**

Before turning to the merits of the pending motion, is helpful to review the standard of review for motions seeking summary judgment, as well as the legal standards relevant to First Amendment retaliation claims under 42 U.S.C. § 1983 and PLRA exhaustion.

A.    RULE 56: MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.[7] For a dispute to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[8]

A party moving for summary judgment bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of [the record], which it believes demonstrate the absence of a genuine

---

[6] Fed. R. Civ. P. 56(a).

[7] *Haybarger v. Laurence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 412 (3d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[8] *Id.* (quoting *Anderson*, 477 U.S. at 248-49).

issue of material fact."[9] "If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways."[10] First, the party moving for summary judgment "may submit affirmative evidence that negates an essential element of the nonmoving party's claim."[11] Second, the party moving for summary judgment "may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."[12]

Once the party moving for summary judgment has met its burden, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[13] To show that there is a genuine dispute of material fact, the non-moving party must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, declarations, stipulations (including those made for the purposes of the motion only), admissions,

---

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[10] *Id.* at 331 (Brennan, J., dissenting); *see also Finley v. Pennsylvania Dep't. of Corrections*, No. 3:12-CV-2194, 2015 WL 1967262, at *9 n.1 (M.D. Pa. Apr. 30, 2015) (observing that the Third Circuit has found that Justice Brennan's dissent in *Celotex* "does not differ with the opinion of the Court regarding the appropriate standards for summary judgment) (citing *In re Bressman*, 327 F.3d 229, 337 n.3 (3d Cir. 2003) and *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987)).

[11] *Celotex*, 477 U.S. at 331 (Brennan J., dissenting).

[12] *Id.*

[13] *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006); *Celotex*, 477 U.S. at 324.

interrogatory answers, or other materials."[14] If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial[,]" summary judgment is appropriate.[15] Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.[16]

Finally, when ruling on a motion for summary judgment, it is not the province of the court to weigh evidence or assess credibility. It must view the evidence presented and draw all inferences in the light most favorable to the non-moving party.[17] The court may not decide whether the evidence unquestionably favors one side or the other or make credibility determinations.[18] Instead, it must decide whether a fair-minded jury could return a verdict for the non-movant on the evidence presented.[19] The Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs

---

[14] Fed. R. Civ. P. 56(c)(1)(A).

[15] *Celotex*, 477 U.S. at 322.

[16] *Anderson*, 477 U.S. at 249.

[17] *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 310 (3d Cir. 2008) (citing *Davis v. Mountaire Farms Inc.*, 453 F.3d 554, 556 (3d Cir. 2006)).

[18] *Anderson*, 477 U.S. at 252.

[19] *Id.*

that of its opponent. It thus remains the province of the fact finder to ascertain the believability and weight of the evidence.[20]

In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[21]

Furthermore, a court may also grant summary judgment *sua sponte*, if the opposing party is given notice and an opportunity to respond.[22]

### B.   RETALIATION CLAIMS UNDER 42 U.S.C. § 1983

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States."[23] "It is well settled that § 1983 does not confer any substantive rights, but merely 'provides a method for vindicating federal rights elsewhere conferred.'"[24] To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) a deprivation of a

---

[20] *Big Apple BMW v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[21] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[22] Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."); *Celotex*, 477 U.S. at 326 ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence.").

[23] *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

[24] *Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017) (quoting *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014)).

federally protected right; and (2) this deprivation was committed by a person acting under color of state law.[25]

Plaintiff, a state inmate, asserts that he was denied a federally protected right because Defendants retaliated against him for filing a complaint under the Prison Rape Elimination Act by denying him meal trays (C/O Smith), verbally harassing him (C/O Smith), charging him with two baseless misconducts (C/O Smith filed Misconduct No. D 074825 and C/O Powell approved charges in Misconduct No. D 362281), and convicting him of one baseless Misconduct (Hearing Examiner Wiederhold in Misconduct No. D 362281). While each of these retaliation claims are unique, Plaintiff must prove the following three elements to prevail on each claim: (1) he engaged in constitutionally protected conduct; (2) adverse action by prison officials sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights was taken against him; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him.[26]

If the inmate shows these first three elements, the burden then shifts to Defendants to "establish that the same decision would have been made even absent any retaliatory motive."[27] This is sometimes referred to as the "same decision" defense.

---

[25] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).
[26] *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003).
[27] *Watson v. Rozum*, 834 F.3d 417, 426 (3d Cir. 2016).

We will address the relevant legal benchmarks as to the first three elements, as well as the "same decision" defense below.

### 1.   Constitutionally Protected Conduct

The constitutionally protected conduct at issue in this case, that forms the basis of each retaliation claim, is Plaintiff's PREA complaint. Filing a PREA complaint implicates conduct that may protected by the First Amendment.[28] Such conduct is not protected conduct, however, if the PREA complaint is "false" or was "filed merely to harass."[29] The parties do not challenge this element of Plaintiff's retaliation claims here. Therefore, we will not reach the issue of whether Plaintiff engaged in protected conduct when he filed his PREA complaint in June 2020.

### 2.   Retaliatory Action Sufficiently Adverse to Deter an Inmate of Ordinary Firmness from Exercising His Rights

The adverse action at issue in this case takes five different forms: (1) denial of food (C/O Smith), (2) verbal harassment (C/O Smith), (3) issuing Misconduct D 074825 (C/O Smith), (4) approving Misconduct No. D 362281 (C/O Powell), and (5) finding Plaintiff guilty of Misconduct No. D 362281 (Hearing Officer Wiederhold).

Action that has, in certain cases, been found to support a retaliation claim includes: (1) filing false misconduct reports; (2) transferring an inmate to another

---

[28] *Robinson v. Palco*, No. 21-2987, 2022 WL 3009746, at *3 (3d Cir. July 29, 2022) (quoting *Mitchell*, 318 F.3d at 531).

[29] *Id.*

prison; and (3) placing an inmate in administrative custody.[30] Conversely, Courts have found some forms of retaliatory acts "are so *de minimis* that they fail to state a retaliation claim as a matter of law."[31] As is relevant here, Courts have found that verbal threats are typically not sufficient to deter an inmate of ordinary firmness from exercising his rights. For example, in *Henry v. CO#2 Gilara*, an inmate-plaintiff filed a PREA complaint because a corrections officer made inappropriate comments about the inmate's sexual orientation, including calling the inmate a "big faggot," offering to collect his and his buddies' ejaculate in a cup so the inmate could drink it, asking the inmate if he had "ever allowed a horse to anally penetrate him or if he ever orally copulated with a dog," and telling the inmate's coworkers that the inmate had AIDS because he was a homosexual.[32] After the PREA complaint was filed, the inmate was transferred to a different housing unit away from the corrections officer. Despite the transfer, the corrections officer continued to verbally harass the inmate by visiting him at the new housing unit and making comments like "you know you are gay, so don't act cool in front of these guys," and saying, "you know you like it rough."[33] The inmate filed a civil rights lawsuit, alleging, among other things, a First Amendment retaliation claim based

---

[30] *Mitchell*, 318 F.3d at 530; *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001); and *Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000).

[31] *Hawkins v. Brooks*, 694 F.Supp.2d 434, 442 (W.D. Pa. 2010).

[32] *Henry v. CO#2 Gilara*, No. 16-167ERIE, 2017 WL 3424863, at *2 (W.D. Pa. Aug. 9, 2017).

[33] *Id.*

on verbal harassment. The Court concluded that the corrections officer's conduct

did not constitute an adverse action as a matter of law, and reasoned that:

> Although Gilara's alleged conduct is far from professional, it does not constitute the requisite adverse action in order to state a *prima facie* claim of retaliation. The Third Circuit has repeatedly held that verbal threats alone do not constitute adverse action for the purposes of establishing a *prima facie* retaliation claim. *Chruby v. Kowaleski*, 534 Fed. App'x 156, 161 (3d Cir. 2013); *Dunbar v. Barone*, 487 Fed. App'x 721, 723 (3d Cir. 2012) (affirming summary judgment for Defendants where Defendants allegedly threatened Plaintiff by telling him that he was a "marked man" and that his "days were numbered"); *Burgos v. Canino*, 358 Fed. App'x 302, 306 (3d Cir. 2009) ("Mere threats do not constitute retaliation."); *Booth v. King*, 228 Fed. App'x 167 (3d Cir. 2007) ("Absent any allegation of physical harm, the defendants' verbal threats do not amount to a constitutional violation.").[34]

### 3. Establishing a Causal Link Between Protected Conduct and Retaliatory Action

To establish the requisite causal link an inmate must prove that his

constitutionally protected conduct was a substantial or motivating factor for the

retaliatory action.[35] To do so, an inmate usually must prove either: (1) there was an

unusually suggestive temporal proximity between the protected activity and the

---

[34] *Id.* at *4; *see also Barney v. Pa. Dep't of Corr.*, No. 3:17-1779, 2021 WL 794562, at *7 (M.D. Pa. Mar. 2, 2021) (dismissing an inmate-plaintiff's retaliation claim that defendants threatened or allowed threats upon his well-being by telling other inmates that plaintiff was complaining about smoking on the block because the verbal threats were not as a matter of law sufficient to deter an inmate of ordinary firmness from engaging in protected activities).

[35] *Rauser*, 241 F.3d at 333.

adverse action; or (2) a pattern of antagonism coupled with timing.[36] If neither of these showings can be made, the claim may still proceed if a plaintiff produces evidence from which a causal connection can be inferred.[37]

To establish a causal link based on timing alone, the alleged retaliatory action must be unusually suggestive of retaliatory motive.[38] The amount of time is usually measured in weeks or months.[39] In the employment discrimination context, periods of as little as seventeen days have been found insufficient to establish causation based on timing alone.[40] These same requirements have been applied to analyze retaliation claims outside the employment context, including cases where an inmate alleges he was retaliated against by a member of the prison staff.

The mere passage of time, however, is not legally conclusive. Courts have found causation exists where the person accused of retaliation engaged in a pattern of antagonistic behavior that links the protected activity and retaliatory action. In the absence of unusually suggestive timing, or a pattern of antagonism coupled

---

[36] *DeFranco v. Wolfe*, 387 F.App'x 147, 154 (3d Cir. 2010) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

[37] *Id.*

[38] *Singleton v. Shearer*, No. 1:17-CV-1027, 2019 WL 3337060, at *6 (M.D. pa. July 25, 2019) ("When showing causation through unusually suggestive timing, the contemplated temporal proximity must be 'on the order of days or weeks.'") (quoting *Rink v. Northeastern Educ. Intermediate Unit*, 717 F. App'x 126, 134 (3d Cir. 2017)).

[39] *Id.*

[40] *See, e.g.*, *Jamison v. Wetzel*, No. 1:13-CV-2129, 2023 WL 791444, at *13 (M.D. Pa. Feb, 25, 2015).

with timing to link the events, an inmate may point to other evidence from the record as a whole from which causation can be inferred.

"A court must be diligent in enforcing these causation requirements" because otherwise prison officials cognizant of the possibility that litigation might be filed against them, particularly in their individual capacity, could be chilled from taking appropriate action.[41] Diligent enforcement, however, does not create a heightened pleading standard. It merely recognizes that courts "should approach [inmate] claims of retaliation with skepticism and particular care due to the near inevitability that [inmates] will take exception with decisions of prison officials and the case with which claims of retaliation may be fabricated."[42]

### 4.    Defendants' Same Decision Defense

Once an inmate has met his burden of proving the first three elements of a retaliation claim, a defendant may show he is not liable because he would have made the same decision even absent retaliatory motive. This defense is sometimes called the "same decision" defense. Defendants raise this defense in response to Plaintiff's retaliation claims against Defendants Powell and Wiederhold.

In *Carter v. McGrady*, an inmate who was well-known among the prison staff for operating as a "jailhouse lawyer" was disciplined for several egregious

---

[41] *Lauren W.*, 480 F.3d at 267.
[42] *Alexander v. Forr*, No. 3:CV-04-0370, 2006 WL 2796412, at *22 (M.D. Pa. Sept. 27, 2006).

violations of prison policy, including using someone else's credit card without authorization to purchase a typewriter for his own personal use and have it delivered to the prison.[43] Despite the overwhelming evidence of his guilt, including irrefutable evidence regarding the fraudulent typewriter purchase, the inmate alleged he was being charged only because he helped other inmates with their legal matters. In simple terms, "there was overwhelming evidence of [the inmate's] guilt and nothing concrete to suggest that he was being charged only because he helped other inmates with their legal matters."[44] Thus, the Third Circuit found that defendants were entitled to summary judgment and explained:

> Given the quantum of evidence of Carter's misconduct, we cannot say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the "broad discretion" that we must afford them. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989). Even if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses, such as receiving stolen property, were so clear and overt that we cannot say that the disciplinary action taken against Carter was retaliatory. Rather, we conclude that the there is no genuine issue of material fact that such action was "reasonably related to legitimate penological interests," and that Carter would have been disciplined notwithstanding his jailhouse lawyering. *Turner*, 482 U.S. at 90.[45]

This language led to some confusion about what evidence, and how much evidence, was required to support the "same decision" defense in inmate retaliatory

---

[43] *Carter v. McGrady*, 292 F.3d 152 (3d Cir. 2002).
[44] *Watson*, 843 F.3d at 427 (Ambro, J. concurring).
[45] *Carter*, 292 F.3d at 159.

discipline cases at summary judgment.[46] In 2016, the Third Circuit addressed the "same decision" defense in a second inmate retaliation case—*Watson v. Rozum*, 834 F.3d 417.

In *Watson*, an inmate owned a radio with a "loose" antenna that the inmate had secured with tape.[47] During a routine cell search, a corrections officer (Kline) pulled the antenna out so far that it broke.[48] Kline advised the inmate that a broken radio was considered contraband and had to be confiscated.[49] Kline filled out a confiscation slip noting that the antenna was broken when he found it, the inmate disagreed and alleged that Kline broke the radio by pulling the antenna out too far.[50] Kline refused to take responsibility or fill out an incident report.[51] The inmate asked a second officer (Simosko) for a grievance form, and Simosko refused to provide it.[52] Later that day, a third officer (Coutts) summoned Plaintiff to the security office and issued Plaintiff a class I misconduct for "destroying, tampering with, or damaging property," because Plaintiff had given the other two officers such a "hard time" about the radio.[53]

---

[46] *Watson*, 834 F.3d at (Ambro, J. concurring).
[47] *Watson*, 834 F.3d at 420.
[48] *Id.*
[49] *Id.*
[50] *Id.* at 420-21.
[51] *Id.*
[52] *Id.* at 421.
[53] *Id.*

The Third Circuit found that the inmate proved a *prima facie* case of retaliation that Coutts retaliated against Plaintiff for asking for a grievance form.[54] The Circuit then analyzed the "same decision" defense to determine whether this claim should go forward to trial.[55] It ultimately concluded that there was a genuine issue of fact as to whether Coutts would have issued the misconduct if the inmate had not threatened to file a grievance about the radio, which precluded the entry of summary judgment.[56] In doing so, it distinguished *Watson* from *Carter*, explaining:

> Watson's situation is different. Watson's broken radio was not so "clear and overt" a violation that we can conclude that he would have been written up if he had not also given prison officials "a hard time." The radio had allegedly been in the same condition for more than a year. Moreover, there is evidence that other inmates had radios with loose or broken antennas, but those items were not confiscated and the inmates did not receive a misconduct. Finally, Kline did not charge Watson with a misconduct when he confiscated the radio. Accordingly, a reasonable fact finder could conclude that the misconduct was issued in retaliation for Watson's statement that he was going to file a grievance, and not in furtherance of legitimate penological goals.[57]

More recently, the Third Circuit analyzed the same decision defense in *Murray v. Smithbower*, No. 21-2156, 2023 WL 5378839 (3d Cir. Aug. 22, 2023). The inmate filed grievances against various corrections officers in the past. Then, filed a PREA complaint alleging that a corrections officer (Myers) conducted an

---

[54] *Id.* at 424.
[55] *Id.* at 425-26.
[56] *Id.*
[57] *Id.* at 426.

inappropriate pat down.[58] Six weeks after filing the PREA complaint, the inmate had a series of conflicts with a second corrections officer (Smithbower).[59] The inmate alleged Smithbower berated him for filing a litany of grievances (against various prison officials) and the PREA complaint (against Myers) while repeatedly (six times) ordering the inmate to return to his cell.[60] The inmate admitted he did not comply with the orders to return to his cell, and instead went to retrieve a scrabble board he left on the table.[61] Smithbower continued to yell at the inmate for filing grievances and threatened to send the inmate to the RHU.[62] Smithbower apparently made good on those threats and transferred the inmate to the RHU.[63] While packing the inmate's belongings, a third officer (Stoner) discovered several unauthorized items.[64] Smithbower issued a misconduct charging the inmate with failure to obey an order, possession of unauthorized items, and threatening an employee with bodily harm.[65] A hearing examiner (Ellenberger) found the inmate guilty of all offenses and sanctioned him to 135 days in the RHU.[66]

---

[58] *Murray v. Smithbower*, No. 21-2156, 2023 WL 5378839, at *1 (3d Cir. Aug. 22, 2023).
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*

The inmate filed a civil lawsuit alleging that Smithbower charged him with misconduct, and Ellenberger convicted him of misconduct, because he filed grievances (against various prison officials) and a PREA complaint (against Myers). The Third Circuit affirmed that the inmate stated a *prima facie* case of retaliation, then analyzed the "same decision" defense to determine whether these claims should go forward to trial.[67] The Third Circuit reasoned that summary judgment was appropriate, explaining:

> Sergeant Smithbower, however, had legitimate reasons to issue the misconduct. The undisputed evidence shows that Murray did disobey an order: he acknowledges that he was told to return to his cell and instead left to retrieve his Scrabble board. *See* ECF No. 99-2 at 53. Similarly, as to the offense for possession of unauthorized items, Murray admitted that some of the confiscated property was considered contraband. *Id.* at 61-63. Moreover, unlike the [inmate] in *Watson*, Murray has not presented evidence that showed other inmates were not sanctioned for similar items or otherwise undermined the officers' stated reasons. *Cf. Watson*, 834 F.3d at 426. And, as to the offense for threatening an employee with bodily harm, based on a video of the incident and Sergeant Smithbower's written report documenting his version of events, *see* ECF No. 92-4 at 2, the Hearing Examiner credited the prison officials' claim that Murray had threatened them as the incident escalated. *Id.* at 8. On this record, there is no genuine issue of material fact that Sergeant Smithbower's issuance of the misconduct was reasonably related to legitimate penological interests and that Murray would have been disciplined regardless of his grievance-filing activities. *See Watson*, 834 F.3d at 426.
>
> Turning to the retaliation claim against Hearing Examiner Ellenberger, summary judgment in his favor was proper, too. In adjudicating the misconduct, Hearing Examiner Ellenberger reviewed the video footage of the incident at Murray's request; considered

---

[67] *Id.* at *2.

Murray's written report setting forth his account of the incident; and considered Sergeant Smithbower's account of the March 2 events. Hearing Examiner Ellenberger credited Sergeant Smithbower's version over Murray's; determined that the video footage corroborated the prison official's account; and found Murray guilty of the offenses set forth in the misconduct. *See* ECF No. 92-4 at 8. No reasonable juror could conclude that Hearing Examiner Ellenberger's misconduct ruling was based on anything other than Murray's violation of prison regulations. *See Carter*, 292 F.3d at 159.[68]

From these three cases, several guiding principles emerge. First, issuing a "legitimate prison disciplinary report," or (in the case of a hearing examiner) convicting an inmate of a legitimate rule violation, is not an absolute bar to a retaliation claim. It is, however, probative, and potent evidence that a defendant's action was not motivated by retaliatory animus.[69] Second, "an official who disciplines an inmate for a 'clear and overt' violation should enjoy a strong presumption that the same decision defense applies."[70]

## C.    PLRA EXHAUSTION OF ADMINISTRATIVE REMEDIES

The Prison Litigation Reform Act ("PLRA") mandates that before an inmate initiates a federal lawsuit related to "prison conditions," they must exhaust "such administrative remedies as are available."[71] This exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or

---

[68] *Id.* at *3.
[69] *Watson*, 834 F.3d at 431 (Ambro, J. concurring).
[70] *Id.*
[71] 42 U.S.C. § 1997e(a).

particular episodes."[72] Absent exhaustion, an inmate's claim is premature, and their case cannot proceed in federal court.[73] PLRA exhaustion is mandatory, and a court may not "excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."[74]

"[T]o properly exhaust administrative remedies [inmates] must 'complete the administrative review process in accordance with the applicable procedural rules."[75] The relevant procedural rules, however, are not defined by the PLRA.[76] Instead, they are defined by the prison grievance process itself.[77] The Third Circuit Court of Appeals has interpreted this requirement as including a procedural default component, holding that inmates must fully satisfy the administrative requirements of the applicable remedy process before proceeding with a claim in federal court.[78] An inmate's failure to comply with the procedural requirements set forth by the agency "bars the [inmate] from brining a claim in federal court unless equitable considerations warrant review of the claim."[79]

---

[72] *Porter v. Nussle*, 534 U.S. 516, 532 (2002).
[73] *Wyatt v. West*, No. 1:23-CV-1457, 2024 WL 3993232, at *3 (M.D. Pa. Aug. 29, 2024).
[74] *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000).
[75] *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)).
[76] *Id.*
[77] *Id.*
[78] *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004).
[79] *Shade v. Pa. Dep't of Corr.*, No. 3:16-CV-1635, 2020 WL 1891856, at *3 (M.D. Pa. Apr. 16, 2020).

Although exhaustion is required where an inmate seeks relief not available in the applicable administrative process, an inmate's failure to exhaust does not bar their claim where there is no administrative remedy available. An administrative remedy is unavailable, and thus exhaustion may be excused, in three situations: (1) "when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) when it is 'so opaque that it becomes, practically speaking, incapable of use,' such as when no ordinary [inmate] can discern or navigate it; or (3) when 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'"[80]

Proper exhaustion is mandatory, even if the inmate seeks relief that cannot be granted by the administrative remedy system. Failure to exhaust administrative remedies is an affirmative defense that defendants must plead and prove.[81] If a defendant proves an inmate did not exhaust administrative remedies before filing his complaint, the burden shifts to the inmate to show that the administrative remedy was not available.[82]

---

[80] *Wyatt*, 2024 WL 3993232, at *3 (quoting *Rinaldi v. United States*, 904 F.3d 257, 266-67 (3d Cir. 2018) (quoting *Ross v. Blake*, 578 U.S. 632, 643-44 (2016))).

[81] *Jones*, 549 U.S. at 216.

[82] *Wyatt*, 2024 WL 3993232, at *3.

Page 37 of 57

**D.  PENNSYLVANIA DEPARTMENT OF CORRECTIONS ADMINISTRATIVE REMEDIES**

The Pennsylvania Department of Corrections maintains multiple administrative remedy processes. The retaliatory discipline claims at issue in this case implicate processes under the Inmate Grievance Policy (DC-ADM 804) and the Inmate Discipline Policy (DC-ADM 801).[83] One remedy generally cannot be substituted for another.[84] Multiple Courts in the Third Circuit have observed, however, that there is some uncertainty regarding the interpretation and application of DC-ADM 801 and DC-ADM 804 to retaliatory discipline claims involving a specific misconduct at the institutional level that may impact the availability of these remedies in certain cases.[85]

**1.  DC-ADM 804**

DC-ADM 804 is the Department of Corrections Policy that applies to most inmate grievances. It operates like a "civil process where complaints are made regarding institutional operations and conditions of confinement."[86] As is relevant to this case, the Policy contains the following "carve out":

Issues concerning a specific inmate misconduct charge, ***conduct of***

---

[83] A copy of each of these policies is available in the summary judgment record.

[84] *Shade*, 2020 WL 1891856, at *3.

[85] *Grisby v. McBeth*, 810 F. App'x 136 (3d Cir. 2020); *Cooper v. Garman*, No. 1:19-CV-02227, 2021 WL 4033113 (M.D. Pa. Sept. 3, 2021).

[86] *Cooper v. Garman*, No. 1:19-CV-02227, 2024 WL 100246, at *11 (M.D. Pa. Jan. 9, 2024).

> ***hearing, statements written within a misconduct and/or other report***,
> a specific disciplinary sanction, and/or the reasons for placement in
> administrative custody will not be addressed through the Inmate
> Grievance System and must be addressed through Department policy
> **DC-ADM 801, "Inmate Discipline"** and/or **DC-ADM 802,
> "Administrative Custody Procedures."**

(DC-ADM 804 § 1(A)(7), Doc. 40-2 p. 5) (emphasis in original). All issues other

than those listed in the "carve out" must be addressed through DC-ADM 804. *Id.*

For issues within its scope, DC-ADM 804 provides a three-step grievance

process:

> First, the Grievance Officer must review the inmate's grievance.
> Second, the Facility Manager must review the inmate's appeal of the
> Grievance Officer's decision. Third, and finally, the Secretary's
> Office of Inmate Grievances and Appeals must review the inmate's
> appeal of the Facility Manager's decision.

(Defendants' SOF, Doc. 41 ¶ 52); (Plaintiff's Response, Doc. 50 ¶ 52) (agreeing

with this summary of DC-ADM 804's three-step process). The Policy also sets

forth the "substantive and procedural requirements for inmate grievances,"

including guidelines about the type of information that must be included in an

inmate's initial grievance. (Defendants' SOF, Doc. 41 ¶ 53); (Plaintiff's Response,

Doc. 50 ¶ 53) (admitting Doc. 41 ¶ 53).

### 2.    DC-ADM 801

DC-ADM 801 is the Department of Corrections Policy that applies to

allegations of inmate misconduct or rule violations. It operates like a criminal

process.[87] This process begins when a member of the prison staff completes a DC-141 form charging an inmate with misconduct or a rule violation. Once written, a DC-141 charge can be disposed of through an informal or formal process. (DC-ADM 801 § 1(A)(1), Doc. 40-22 p. 8). This case involves one charge handled informally (No. D 074825) and one handed formally (No. D. 362281).

When a misconduct or rule violation is referred for informal resolution, a meeting is scheduled with the inmate. At the meeting, the unit manager or a designee may take one of the actions listed in DC-ADM 801 § 2(B)(1), which include no action, a reprimand, cell restriction or a loss of privileges for no more than 14 days and may assess restitution if the state's property was destroyed during the commission of the rule violation at issue. (DC-ADM 801 § 2(B)(1), Doc. 40-22 p. 18). For the purposes of parole, informal resolutions are not considered misconducts. (DC-ADM 801 § 2(C)(4), Doc. 40-22 p. 19).

If an inmate refuses to attend the informal resolution meeting, the matter is forwarded to the Hearing Examiner for formal resolution. (DC-ADM 801 § 2(C)(3), Doc. 40-22 p. 19).

When a misconduct or rule violation is resolved formally, it is forwarded to the Hearing Examiner. An evidentiary hearing is held, and the Hearing Examiner decides based on that evidence, whether guilt has been proven by a preponderance

---

[87] *Cooper*, 2024 WL 100246, at *11.

of the evidence. (DC-ADM 801 §§ 3, and 4, Doc. 40-22 pp. 20-29). If the Hearing examiner concludes the inmate is not guilty, the decision shall be in writing but need not include a written rationale. *Id.* If the Hearing Examiner concludes that an inmate is guilty, the Hearing Examiner will prepare a written summary that "includes the facts relied upon," and "findings of fact concerning the testimony of each witness." *Id.* The Hearing Officer also has the authority to impose a variety of disciplinary sanctions. *Id.*

DC-ADM 801 sets out the following three-step appeals process that is available for charges resolved either informally or formally:

> [First, the inmate] may file an appeal with the Program Review Committee ("PRC") at his institution within fifteen calendar days of his hearing. [Second,] [t]he inmate may appeal the decision of the PRC to the Facility Manager/designee within seven calendar days of receipt of the written PRC decision. The decision of the Facility Manager/designee shall be in writing and shall be forwarded to the inmate with in seven working days of receipt of the appeal. [Third,] [t]he inmate may appeal the decision of the Facility Manager/designee to the Chief Hearing Examiner, within seven calendar days of the receipt of the Facility Manager/designee's decision. The Chief Hearing Examiner's Officer shall review and respond to every misconduct appeal to final review within seven working days of receipt of all necessary records.[88]

The issues that may be raised on appeal through this process, however, are limited. An inmate may appeal the informal resolution of a misconduct or rule

---

[88] *Pena v. Clark*, No. 3:19-CV-01536, 2021 WL 4477274 at *4 (M.D. Pa. Sept. 29, 2021), *aff'd*, 21-2931, 2022 WL 897037 (3d Cir. Mar. 28, 2022); *see also*, (DC-ADM 801 § 5, Doc. 40-22, pp. 30-34).

violation only where he believes that the sanction is disproportionate to the offense. (DC-ADM 801 § 2(C)(2), Doc. 40-22 p. 19). Generally, an inmate may appeal the formal resolution of a misconduct only where he believes: (1) "the procedures employed were contrary to law, Department directives, or regulations"; (2) "the punishment is disproportionate to the offense"; and/or (3) "the findings of fact were insufficient to support the decision." (DC-ADM 801 § 5(A)(1), Doc. 40-22 p. 30).

With this legal framework in mind, we turn to an analysis of the arguments raised in Defendants' Motion.

## IV.     DISCUSSION

In this Motion, Defendants assert that they are entitled to summary judgment as to all claims Plaintiff asserts against them. We will address each claim, and the arguments raised, below.

### A.     PLAINTIFF'S RETALIATORY DENIAL OF FOOD CLAIM AGAINST C/O SMITH

Regarding his retaliatory denial of food claim against C/O Smith, Plaintiff alleges that while Plaintiff was in the RHU, C/O Smith "denied the Plaintiff his food trays whenever he worked the unit." (Doc. 19 ¶ 35).

Defendants argue that they are entitled to summary judgment for this claim because Plaintiff did not exhaust his claim as required under the PLRA. (Doc. 40

pp. 10-11). They argue that Plaintiff did not file any grievance under DC-ADM 804 regarding the "withholding of a food tray." (Doc. 40 p. 11).

In response, Plaintiff agrees that he did not exhaust his claim against C/O Smith related to the retaliatory denial of a food tray. (Doc. 49 p. 16). Accordingly, Defendants are entitled to summary judgment as to the retaliatory denial of food claim against C/O Smith because there is no dispute that this claim was not exhausted under the PLRA.

### B.   PLAINTIFF'S RETALIATORY VERBAL HARASSMENT CLAIM AGAINST C/O SMITH

Plaintiff alleges that, after he filed a PREA complaint against C/O Smith alleging sexual harassment, C/O Smith began to verbally harass Plaintiff. (Doc. 19 ¶¶ 20, 22, 35). Plaintiff does not identify specific dates in his Amended Complaint and does not provide many details about the nature of the harassment. Those details, however, have been sharpened based on the grievance documents included in the summary judgment record. The grievance documents demonstrate Plaintiff complained of verbal harassment that took place on June 19, 2020, and July 11, 2020. Defendants, however, only address the incident on July 11, 2020, in their Motion.

Regarding the July 11, 2020 incident, Plaintiff alleges that C/O Smith told Plaintiff that only "p[***]ys file grievances," then while Plaintiff was within

earshot offered to pay another inmate to harm Plaintiff. (Doc. 40-6 p. 2); (*see also* Doc. 19 ¶ 22).

Defendants argue that they are entitled to summary judgment as to the July 11, 2020 retaliatory verbal harassment claim against C/O Smith. To support their argument, Defendants attack the credibility of the written statements in Grievance No. 878355 and argue that Plaintiff offers no evidence of a causal link between the PREA complaint and C/O Smith's July 11, 2020 verbal harassment. (Doc. 40 pp. 24-25).[89]

---

[89] Defendants cite to *Scott v. Harris*, a United States Supreme Court case for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." (Doc. 40 p. 21) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). In *Scott*, the Supreme Court noted that where one party's version of the facts was "utterly discredited" by a video, the Court should view the facts in the light depicted on the video. *Scott*, 550 U.S. at 380-81. In this case, however, there is no video or audio recording of the alleged "verbal harassment" in the summary judgment record. They nonetheless appear to argue that Plaintiff's account of the verbal harassment should be discredited entirely because "[t]here is documentary evidence and witness statements that all contradict Plaintiff's version of events and leave no genuine dispute as to any material facts." (Doc. 40 p. 21). The documentary evidence submitted, relevant to the verbal harassment, is limited to Plaintiff's grievance and the administrative responses to it. Defendants appear to place great weight on the fact that Plaintiff's claim that C/O Smith stared at him with a "death stare," was denied because C/O Smith's eyes were obscured by sunglasses. In this case, however, Plaintiff alleges he was *verbally* harassed. The responses denying Plaintiff's grievances do not "utterly discredit" Plaintiff's account of what C/O Smith said to him that day. Because the statements written in Grievance No. 878355 about verbal harassment are not "utterly discredited" by video evidence, we must interpret the evidence in the light most favorable to Plaintiff and conclude there is a dispute as to whether C/O Smith actually made the

In response, Plaintiff argues that he is not relying on temporal proximity alone to prove causation. He also contends that he has provided enough evidence to show that C/O Smith's verbal harassment was motivated by Plaintiff's PREA complaint. (Doc. 49 p. 14). We agree. The statement at issue directly references Plaintiff's use of the grievance process—which Plaintiff used to initiate his PREA complaint. Thus, Plaintiff has presented some evidence from which causation could be inferred. Therefore, summary judgment is not appropriate based on Plaintiff's failure to offer any evidence of a causal link.

We nonetheless find that summary judgment is appropriate as to both incidents of retaliatory verbal harassment for a reason not raised by either party. To satisfy the second element of a First Amendment retaliation claim—adverse action—a plaintiff's allegations must be sufficient to demonstrate that the defendant's actions would deter an inmate of ordinary firmness from engaging in the protected activity at issue.[90]

Plaintiff's allegations suggest C/O Smith said inappropriate and unprofessional things. However, verbal threats made by a correctional officer to an inmate are not sufficient, as a matter of law, to satisfy the second element of an inmate's retaliatory harassment claim. While we in no way condone the things C/O

___

statements alleged. As we explain, however, even assuming C/O Smith made those statements, they are not sufficient as a matter of law to deter an inmate of ordinary firmness from exercising his rights.

[90] *Hawkins*, 694 F.Supp.2d at 442.

Smith allegedly said to Plaintiff, the verbal harassment he endured does not violate the United States Constitution. The parties are therefore on notice pursuant to Fed. R. Civ. P. 56(f) that summary judgment will be entered as to all of Plaintiff's claims of retaliatory verbal harassment against C/O Smith if no opposition is filed within thirty days of the date of this Memorandum Opinion.

### C.   PLAINTIFF'S RETALIATORY DISCIPLINE CLAIM AGAINST C/O SMITH

Regarding his retaliatory misconduct claim against C/O Smith, Plaintiff alleged:

> Defendant Smith further showed retaliatory conduct towards Plaintiff while Plaintiff was in general population by issuing Plaintiff a misconduct, falsifying charges that was later dismissed by the unit manager of Plaintiff's Block once he discovered that Plaintiff had filed a PREA against Defendant Smith.

(Doc. 19 ¶ 41). Notably, Plaintiff did not include a date, or discuss the nature of the charge. Based on his summary judgment response and the evidence provided, Plaintiff's retaliatory discipline claim against C/O Smith appears to involve an August 15, 2021 rule violation charge assigned number D 074825. (Doc. 49 p. 17).

First, Defendants argue that summary judgment should be granted for Plaintiff's claim that C/O Smith retaliated against Plaintiff by filing a false misconduct because Plaintiff did not exhaust the available administrative remedy. As to which process was appropriate, Defendants assert, without any analysis, that

Plaintiff was required to exhaust this claim under DC-ADM 804. (Doc. 40 pp. 10-11).

Plaintiff argues that there is no remedy available under DC-ADM 804 for claims of retaliatory discipline related to a specific misconduct proceeding. In doing so, he relies on the "carve out" in DC-ADM-804 § 1(A)(7) and cites to three of Defendants' exhibits wherein grievances filed under DC-ADM 804 alleging retaliatory discipline related to a specific misconduct were rejected and Plaintiff was instructed to address his claims using the procedures under DC-ADM 801. (Doc. 49 pp. 16-17); (Docs. 40-9, 40-10, 40-11).[91] Plaintiff's argument echoes concerns expressed by the Third Circuit Court of Appeals more than four years ago that "there is a serious question whether . . . DC-ADM-801 and DC-ADM-804 are available to [inmates] as a method to grieve" retaliatory discipline claims involving a specific misconduct.[92] Defendants did not submit a reply brief, and therefore left this serious question unanswered. Plaintiff has presented evidence establishing a dispute of fact as to whether the SCI Mahanoy staff had a policy or practice of

---

[91] Plaintiff also cites to DC-ADM 801 and argues that this policy does not allow for an appeal of the "circumstances surrounding the resolution" of Misconduct No. D 074825. (Doc. 49, p. 17); (DC-ADM 801 § 5(A), Doc. 40-22, p. 30) (limiting inmates to certain issues to appeal); (DC-ADM 801 § 2(C), Doc. 40-22, p. 19) (limiting issues that can be raised on appeal in cases resolved informally).

[92] *Grisby*, 810 F. App'x at 138 n. 1 (holding that if "prison officials maintain[ed] a policy of rejecting all grievances that even mention a misconduct" that would make the remedy unavailable).

rejecting inmate grievances alleging retaliatory discipline relating to a specific misconduct report as inappropriately brought under DC-ADM 804. If that is the case, the remedy Defendants argue Plaintiff failed to exhaust was not available. This factual dispute precludes the entry of summary judgment for failure to exhaust.

Second, Defendants argue that they are entitled to summary judgment because C/O Smith did not issue any misconduct against Plaintiff, and therefore there was no adverse action. (Doc. 40 p. 22). To support their argument, Defendants rely on two documents, a "Query" of misconducts issued against Plaintiff, and a report documenting misconducts C/O Smith issued. (Docs. 40-26, 40-27). These reports do not document any misconduct issued to Plaintiff by C/O Smith, and do not list the rule violation charge No. D 074825.

Plaintiff produced a copy of a DC-141 form in which C/O Smith cited Plaintiff for using abusive or inappropriate language, refusing to obey an order, and being present in an unauthorized area. (Doc. 49-2 p. 1). This rule violation charge was resolved informally. *Id.* Plaintiff alleges the charge was "dismissed by the unit manager." (Doc. 19 ¶ 41). Plaintiff produced evidence that creates a dispute of fact as to whether C/O Smith issued a "misconduct" or rule violation charge. This dispute of fact precludes the entry of summary judgment.

We nonetheless find that summary judgment is appropriate for a reason not raised by either party. Through Defendants' summary judgment motion, Defendants and Plaintiff introduced evidence clarifying the scope of Plaintiff's retaliatory misconduct claim against C/O Smith, and the relevant timeline of events.

The protected activity at issue is filing a PREA complaint. Plaintiff filed his PREA complaint as a grievance on June 6, 2020. C/O Smith was interviewed about that PREA complaint on June 24, 2020. (Doc. 40-18 p. 9). Thus, there is no dispute that C/O Smith learned of the PREA complaint at some point between June 6, 2020 and June 24, 2020. The adverse/retaliatory action at issue is rule violation charge No. D 074825, issued on August 15, 2021. Even assuming Plaintiff met his burden of showing the PREA Complaint was protected activity, and rule violation charge D 074825 amounts to adverse action, he does not establish the third element of this retaliation claim, causation.

To evaluate whether there is a triable issue of fact as to causation, we first look to see if there is an unusually suggestive temporal proximity between the protected activity and the adverse action. In this case, more than one year lapsed between the protected activity and adverse action. Thus, a causal link cannot be inferred based on timing alone.

Next, we consider whether causation may be reasonably inferred through a pattern of antagonism plus timing. The summary judgment record documents that Plaintiff complained of verbal and other harassment by C/O Smith in June 2020, July 2020, November 2020, and later learned that in September 2020 C/O Smith offered an inmate an extra food tray and a single cell to harass Plaintiff. (Docs. 40-4, 40-6, 40-26, and 49-4). There is at least a dispute as to whether C/O Smith engaged in a pattern of antagonism. Coupled with timing, however, this pattern is not sufficient to infer causation. The purported antagonism documented in this record ended in November 2020. Thus, even viewed as a pattern, the antagonism ended nine months before the misconduct was issued. This nine-month gap effectively breaks the link between that pattern and the August 2021 misconduct.

Last, we look to the record as a whole to determine whether there is any other evidence linking the June 2020 PREA complaint to the August 2021 rule violation charge. Once again, we come up short. This charge involved rule violations for the use of inappropriate language, refusal to obey an order, and Plaintiff's unauthorized presence in the laundry room. No other evidence in the summary judgment record suggests C/O Smith charged Plaintiff with violating the rules in August 2021 because Plaintiff filed a PREA complaint in June 2020. Thus, nothing more than speculation links these two events.

In the absence of evidence of a causal link, Plaintiff has not established a *prima facie* claim of retaliatory discipline against C/O Smith. Therefore, the entry of summary judgment in Defendants' favor is appropriate. The parties are therefore on notice pursuant to Fed. R. Civ. P. 56(f) that summary judgment will be entered as to this claim if no opposition is filed within thirty days of the date of this Memorandum Opinion.

### D.  PLAINTIFF'S RETALIATORY DISCIPLINE CLAIMS AGAINST C/O POWELL

Plaintiff alleges that he was disciplined for reporting sexual harassment in good faith. After reviewing the prison staff's investigation and the evidence upon which it was based, the BII determined Plaintiff's allegations were "unfounded." The Pennsylvania Department of Corrections' PREA policy provides that:

> Reporting inmates shall be subject to disciplinary action for sexual abuse or sexual harassment allegations which have been unfounded, and for which the investigation was satisfactorily approved by the Bureau of Investigations and Intelligence (BII).

(DC-ADM 008 §17(C)(8), Doc. 40-17 p. 3).

Plaintiff alleges that C/O Powell approved a misconduct charging him with lying in his PREA complaint (against C/O Smith) to retaliate against Plaintiff for filing that PREA complaint.

Defendants argue they are entitled to summary judgment under the "same decision" defense. They argue that "[t]he Department had a valid penological

interest in issuing misconduct number D362281 and there was a quantum of evidence to support the misconduct was not issued in retaliation for filing the PREA allegations." (Doc. 20 p. 28).

In response, Plaintiff argues that the misconduct report should not have been issued because the BII's decision was wrong.[93] This argument, however, misses the mark. Nothing in Plaintiff's Complaint or in the summary judgment record suggests C/O Powell was involved in the BII decision or underlying PREA investigation, or even had access to the decision when approving the misconduct. Furthermore, C/O Powell was not responsible for determining Plaintiff's guilt or innocence regarding the offense charged. The question before us as to this retaliation claim is whether C/O Powell would have approved this misconduct charge in the absence of retaliatory motivation. The undisputed material facts in this case lead us to conclude he would have.

The undisputed facts show that this misconduct alleged a "clear and overt" violation of prison rules, and that C/O Powell approved this misconduct for reasons reasonably related to a legitimate penological interest. Regardless of whether its

---

[93] Plaintiff cites to the BII's closing memo, in which it finds, "[t]here was an assisting officer at the cell door when CO Smith approached Inmate Ford's door . . . ." (Doc. 40-19). We agree that this statement is inconsistent with Lieutenant Briscoe's investigatory summary and the video. The investigatory summary and video suggest C/O Randall was "in close proximity to CO Smith" when the incident occurred, but that C/O Smith arrived at Plaintiff's cell door before C/O Randall did. (PREA Investigatory Summary, Doc. 40-18, p. 15, 18); (Pod Camera Video at 12:49:12-12:49:22, Doc. 43).

decision was correct or incorrect, it is undisputed that the BII determined Plaintiff's PREA complaint was "unfounded." It is also undisputed that if the BII deems an inmate's PREA complaint unfounded, the inmate "_shall_ be subject to disciplinary action."[94] Given the clear nature of the rule violation and misconduct alleged, there is a strong presumption that the same decision defense applies. Further, reviewing these facts it is clear Misconduct No. D 362281 would have been issued in the absence of any retaliatory motive C/O Powell may have had, as it was required under DOC policy based on the BII's decision.

Accordingly, we will grant summary judgment in Defendants' favor as to Plaintiff's retaliatory discipline claim against C/O Powell.

### E.   PLAINTIFF'S RETALIATORY DISCIPLINE CLAIM AGAINST DEFENDANT WIEDERHOLD

Once it was issued, Misconduct No. D 362281 was referred to Hearing Examiner Wiederhold. Hearing Officer Wiederhold reviewed the evidence and determined that Plaintiff was guilty of lying to staff by a preponderance of the evidence. Defendants argue that they are entitled to summary judgment for two reasons.

First, Defendants argue that they are entitled to summary judgment because Plaintiff did not exhaust his retaliatory discipline claim against Hearing Officer Wiederhold under DC-ADM 804. (Doc. 40 p. 10).

---

[94] (DC-ADM 008 §17(c)(8), Doc. 40-17 p. 3) (emphasis added).

Plaintiff responds that a grievance alleging claims of retaliatory discipline related to a specific misconduct would have been rejected under DC-ADM 804 and asserts that he exhausted under DC-ADM 801. (Doc. 49 p. 15). The summary judgment record includes three prior misconducts Plaintiff filed that were rejected for this reason, and it is undisputed that Plaintiff appealed Misconduct No. D 362281 to final review.

We find that there is enough evidence to raise a dispute of fact as to whether DC-ADM 804 was "available" to exhaust this claim.

Second, Defendants argue they are entitled to summary judgment under the "same decision" defense. They argue that "[t]he Department had a valid penological interest in issuing misconduct number D362281 and there was a quantum of evidence to support the misconduct was not issued in retaliation for filing the PREA allegations." (Doc. 20 p. 28).

In response, Plaintiff argues that Hearing Examiner Wiederhold would not have reached the same conclusion absent retaliatory motive because the BII's decision was incorrect. This argument misses the mark. The inquiry before us is not whether the BII was correct, or even whether Hearing Examiner Wiederhold's decision was correct. It is whether, based on the undisputed facts, Hearing Examiner Wiederhold would have reached the same decision absent retaliatory motivation. We conclude that this is the case.

As we have already observed, the conduct alleged is a clear and overt rule violation. Thus, there is a strong presumption that the same decision defense applies. Moreover, it is undisputed that, under DC-ADM 801 a Hearing Examiner is required to make the relevant "determinations of credibility" during misconduct proceedings. (DC-ADM 801 § 3(A)(4), Doc. 40-22 p. 23). It is undisputed that, under the same policy, a Hearing Examiner is required to issue a finding of guilt if "a preponderance of evidence exists that the inmate committed the misconduct and issue a finding of guilt." (DC-ADM 801 § 4(a)(1), Doc. 40-22 p. 25). A preponderance of the evidence means that it is more likely than not that the misconduct occurred.

There is no dispute in this case that Hearing Examiner Wiederhold was required to judge the credibility of conflicting evidence. Plaintiff stated that C/O Smith made an inappropriate comment about his genitals. C/O Smith denied it, and a staff witness that video evidence revealed was in "close proximity" (but was not immediately next to) C/O Smith did not hear C/O Smith say anything sexual or derogatory to Plaintiff. The evidence of misconduct is not as irrefutable here as it was in *Carter*. However, the Third Circuit's analysis in *Murray* is instructive. There, the Hearing Examiner reviewed competing witness statements and a video, and concluded the staff witness statements were more credible than the inmate's statements. When analyzing the "same decision" defense, the Circuit concluded

that summary judgment was appropriate because no reasonable juror could conclude that the Hearing Examiner's misconduct ruling was based on anything other than the inmate's violation of prison regulations. And so, it is in this case as well. Hearing Examiner Wiederhold had a well-developed record to review and base his decision on, he had the discretion to weigh the credibility of those statements and did so. His interpretation of the record was not unreasonable, and there is no evidence in the summary judgment record that suggests Hearing Examiner Wiederhold's decision was based on anything other than the evidence before him. Therefore, we conclude he would have reached the same decision absent retaliatory motive.

Accordingly, we will grant summary judgment in Defendants' favor as to Plaintiff's retaliatory discipline claim against Hearing Officer Wiederhold.

## V.    CONCLUSION

Accordingly, we conclude that Defendants' Motion for Summary Judgment (Doc. 39) is GRANTED in part as follows:

(1)    Summary judgment is GRANTED as to Plaintiff's claim of Retaliatory Denial of Food against C/O Smith.

(2)    Summary Judgment is GRANTED as to Plaintiff's claim of Retaliatory Discipline against C/O Powell. C/O Powell is therefore no longer a party to this case.

(3)    Summary Judgment is GRANTED as to Plaintiff's claim of Retaliatory Discipline against Hearing Examiner Wiederhold. Hearing Examiner Wiederhold is therefore no longer a party to this case.

(4)    We conclude *sua sponte* that summary judgment is appropriate for reasons not raised by the parties as to Plaintiff's two remaining claims (Retaliatory Verbal Harassment and Retaliatory Discipline) against C/O Smith. *See* Fed. R. Civ. P. 56(f). Because we reached this conclusion *sua sponte*, we will allow each party to respond to our reasoning in writing, and if necessary, to supplement the summary judgment record as to these two claims. **These objections are due in thirty (30) days. If no objections are received in thirty (30) days, summary judgment will be entered as to these two remaining claims and this case will be closed.**

(5)    An appropriate order will be issued.


Date: September 27, 2024                    BY THE COURT

                                            *s/William I. Arbuckle*
                                            William I. Arbuckle
                                            U.S. Magistrate Judge