UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK FORD, | ) | CIVIL ACTION NO. 4:21-CV-1957 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| TYLER SMITH, *et al.*, | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION**

## I.     INTRODUCTION

Mark Ford ("Plaintiff") is a state inmate presently confined in Mahanoy State Correctional Institution ("SCI Mahanoy"). We granted summary judgment as to several of Plaintiff's claims, and directed the parties to file objections on the issue of whether summary judgment should also be granted as to Plaintiff's two remaining retaliation claims against C/O Smith.

Having reviewed those objections, we will grant summary judgment in Defendants' favor as to the two remaining claims and will close this case.

## II.     BACKGROUND AND PROCEDURAL HISTORY

### A.     PROCEDURAL HISTORY IN THIS CASE

On November 17, 2021, Plaintiff lodged a Complaint, pending the disposition of his accompanying application requesting leave to proceed without the prepayment of fees. (Docs. 1, 2). On November 22, 2021, Plaintiff was granted leave to proceed without the prepayment of fees, his Complaint was deemed filed,

and Defendants were sent a copy of the Complaint, notice of lawsuit, and a request to waive service of summons. (Doc. 6). Defendants waived service. (Docs. 7, 10).

On January 20, 2022, Defendants filed a Motion to Dismiss. (Doc. 13). Along with their Motion, Defendants filed a supporting brief. (Doc. 14).

In response to Defendants' Motion, and after seeking and being granted additional time, on March 18, 2022, Plaintiff filed an Amended Complaint. (Doc. 19). Defendants' Motion to Dismiss was deemed moot based on the Amended Complaint. (Doc. 22).

On March 23, 2022, Defendants filed a Second Motion to Dismiss. (Doc. 20). Along with their Motion, Defendants filed a supporting brief. (Doc. 21). After being granted an extension of time to respond *sua sponte*, Plaintiff filed his Brief in Opposition. (Doc. 24). On December 27, 2022, Defendants' Motion to Dismiss was granted in part and denied in part. (Docs. 26, 27). Retaliation claims against three Defendants (C/O Smith, C/O Powell, and Hearing Examiner Wiederhold) were permitted to proceed. Those retaliation claims included:

(1)    A § 1983 claim of First Amendment retaliatory denial of food against C/O Smith;

(2)    A § 1983 claim of First Amendment retaliatory verbal harassment against C/O Smith;

(3)    A § 1983 claim of First Amendment retaliatory discipline by C/O Smith;

(4)     A § 1983 claim of First Amendment retaliatory discipline against C/O Powell; and

(5)    A § 1983 claim of First Amendment retaliatory discipline against Hearing Examiner Wiederhold.

As relief, Plaintiff requests compensatory and punitive damages.

On January 5, 2023, the remaining Defendants filed their Answer. (Doc. 28). A Case Management Order setting pretrial deadlines was issued, and the parties engaged in discovery. (Doc. 29).

On August 2, 2023, Defendants filed a Motion for Summary Judgment. After that motion was fully briefed, the undersigned issued a memorandum opinion, and an order granting Defendants' summary judgment motion in part. The undersigned also determined that summary judgment may be appropriate for reasons not raised by the parties as to Plaintiff's two remaining claims against the only remaining Defendant—C/O Smith. Those two remaining claims are:

(1)    That C/O Smith verbally harassed and verbally threatened Plaintiff in retaliation for filing a PREA complaint against C/O Smith in violation of the First Amendment; and

(2)    That C/O Smith charged Plaintiff with prison misconduct in retaliation for filing a PREA complaint against C/O Smith in violation of the First Amendment.

At the conclusion of the opinion, and in the accompanying order, we stated:

We conclude *sua sponte* that summary judgment is appropriate for reasons not raised by the parties as to Plaintiff's two remaining claims (Retaliatory Verbal Harassment and Retaliatory Discipline) against C/O Smith. *See* Fed. R. Civ. P. 56(f). Because we reached this conclusion *sua sponte*, we will allow each party to respond to our reasoning in writing, and if necessary, to supplement the summary judgment record as to these two claims. **These objections are due in thirty (30) days. If no objections are received in thirty (30) days,**

**summary judgment will be entered as to these two remaining claims and this case will be closed.**

(Doc. 53, p. 57); (Doc. 54).

On October 28, 2024 and January 2, 2025, Plaintiff requested extensions of time to file his objections. (Docs. 55, 57). Plaintiff's requests were granted. On January 29, 2025, Plaintiff filed his objections. (Doc. 59). On February 5, 2025, Defendants filed their response. (Doc. 61).

### B.    FACTS RELEVANT TO PLAINTIFF'S REMAINING CLAIMS AGAINST C/O SMITH

#### 1.    Plaintiff's PREA Complaint and Misconduct No. D 362281

In June 2020, Plaintiff filed a PREA complaint against C/O Smith that was later deemed "unfounded." Plaintiff was then charged with lying to an employee because he filed an "unfounded" PREA complaint. The retaliation claims against C/O Smith, C/O Powell, and Hearing Examiner Wiederhold all cite to this PREA complaint as the "protected activity" that provoked the retaliatory conduct at issue. Below, we will summarize the PREA Complaint and related administrative proceedings.

a.    **June 3, 2020: Date of Alleged Sexual Harassment by C/O Smith**

On June 3, 2020, Plaintiff was naked and housed in psychiatric observation cell H/B 12 after reporting thoughts of self-harm.[1] While there, he had an interaction with C/O Smith that lasted approximately ten seconds. (Pod Camera Video at 12:49:12-12:49:22, Doc. 43). C/O Smith's back was to the pod camera for the entire interaction. *Id.*

For the first five seconds, C/O Randall was a short distance away, or was walking towards C/O Smith. *Id.* For the second five seconds, C/O Randall was standing next to C/O Smith. *Id.* After the interaction between C/O Smith and Plaintiff concluded, C/O Randall remained by Plaintiff's door, and they continued to speak. (Pod Camera Video at 12:49:22-12:49:58, Doc. 43). Plaintiff and the Corrections Officers have very different recollections of that interaction.

Plaintiff alleges that C/O Smith sexually harassed him by saying "if I had to walk around with a dick like that I'd want to kill myself too." (Grievance No. 872182, Doc. 40-4, p. 2); (Inmate Statement of Sexual Harassment, Doc. 40-18 p. 5).

C/O Smith recalls that Plaintiff asked C/O Smith to get Plaintiff's clothing. (Smith's Written Statement, Doc. 40-18 p. 9). He denies making any inappropriate

---

[1] Plaintiff was given a suicide smock but chose not to wear it because it irritated his skin. (PREA Investigation Report, Doc. 40-18, p. 19); (PREA Case Data, Doc. 40-18, p. 2).

remarks about Plaintiff but claimed that Plaintiff threatened to file a PREA complaint if C/O Smith refused to bring his clothes. *Id.*; (DC-17X Form, Doc. 40-21 p. 2). Similarly, C/O Randall denied that he or C/O Smith said anything sexual or derogatory to Plaintiff during that interaction. (Randall's Written Statement, Doc. 40-18 p. 6). Two other Corrections Officers (Greenzweig and Webb) working in the same area both stated that Plaintiff did not verbally report any harassment, C/O Greenzweig stated that he did not hear C/O Smith use any negative or derogatory language. (Greenzweig and Webb's Written Statements, Doc. 40-18 pp. 7-8).

### b.    June 6, 2020: Initial Report of Sexual Harassment in Grievance No. 872182

On June 6, 2020, Plaintiff filed a grievance to report the alleged sexual harassment by C/O Smith that occurred three days earlier under the Inmate Grievance Policy (DC-ADM 804). (Defendants' SOF, Doc. 41 ¶ 18); (Plaintiff's Response, Doc. 50 ¶ 18) (admitting Doc. 41 ¶ 18); (Grievance No. 872182, Doc. 40-4 p. 2).

On June 9, 2020, the facility grievance coordinator (J. Mahally) rejected Plaintiff's grievance and responded that his allegation would be handled through a PREA investigation. (Defendants' SOF, Doc. 41 ¶ 19) (stating that Grievance No. 872182 was handled as a PREA complaint); (Plaintiff's Response, Doc. 50 ¶ 19) (admitting Doc. 41 ¶ 19); (Grievance No. 872182 Rejection, Doc. 40-4 p. 4).

### c.    PREA Investigation

On June 10, 2020, a PREA investigation was opened by the SCI Mahanoy Security Office. (PREA Case Data, Doc. 40-18 p. 2).

The State Police were notified of the PREA investigation. (PSP Investigation Determination, Doc. 40-18 p. 10). Trooper Tray investigated. *Id.* On June 12, 2020, Trooper Tray determined that the incident was unsubstantiated, that there was no evidence to support Plaintiff's allegation, and closed the investigation. *Id.*

Lieutenant Briscoe conducted the Department of Corrections' investigation. Lieutenant Briscoe interviewed Plaintiff, C/O Smith, and three staff witnesses (Randall, Greenzweig, and Webb). (Defendants' SOF, Doc. 41 ¶¶ 20-21); (Plaintiff's Response, Doc. 50 ¶¶ 20-21) (admitting that Lieutenant Briscoe was assigned to investigate); (Inmate and Staff Written Statements, Doc. 40-18 pp. 5-9). He preserved and viewed the video footage. (Shift Commander Checklist, Doc. 40-18 p. 13); (Investigative Summary, Doc. 40-18 p. 15). He reviewed prior PREA complaints filed by Plaintiff. (Investigative Summary, Doc. 40-18 p. 15). On June 29, 2020, he completed his written investigative summary, and attached relevant evidence to it. (Defendants' SOF, Doc. 41 ¶ 21); (Plaintiff's Response, Doc. 50 ¶ 21) (admitting Lieutenant Briscoe completed an Investigative Summary); (Investigative Summary, Doc. 40-18 pp. 14-20).

DC-ADM 008 § 18(C)(9)(b)(2) requires that, when completing an investigative summary, the investigator must indicate a conclusion of whether the evidence supports a finding that sexual abuse or harassment has occurred. (DC-ADM 008, Doc. 40-17 p. 11). The investigator may determine that the allegation is: (1) substantiated; (2) unsubstantiated; or (3) unfounded. *Id.* An allegation is "substantiated" where it "was investigated and determined to have occurred." (DC-ADM 008 Glossary, Doc. 40-17 p. 18). An allegation is "unsubstantiated" if it "was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred." *Id.* An allegation is "unfounded" if it "was investigated and determined not to have occurred." *Id.*

A report of sexual abuse made in good faith that is found to be "unsubstantiated" cannot constitute "falsely reporting an incident" or "lying" for the purposes of inmate discipline. (DC ADM-008 § 17(C)(6), Doc. 40-17 p. 3); (Defendants' SOF, Doc. 41 ¶ 25); (Plaintiff's Response, Doc. 50 ¶ 25) (admitting Doc. 41 ¶ 25). An inmate who reports sexual abuse that has been determined to be "unfounded," however, "shall be subject to disciplinary action." (DC ADM-008 § 17(C)(8), Doc. 40-17 p. 3); (Defendants' SOF, Doc. 41 ¶ 25); (Plaintiff's Response, Doc. 50 ¶ 25) (admitting Doc. 41 ¶ 25).

At the end of his investigative summary, Lieutenant Briscoe concluded that Plaintiff's allegations were unsubstantiated, and recommended that the investigation be closed. (Investigative Summary, Doc. 40-18 p. 18).

Captain Dunkle reviewed and approved Lieutenant Briscoe's Investigative Summary. (Defendants' SOF, Doc. 41 ¶ 22); (Plaintiff's Response, Doc. 50 ¶ 22) (admitting Doc. 41 ¶ 22);  (Investigative Summary, Doc. 40-18 p. 1).

On July 1, 2020, the Investigative Summary was sent to the Bureau of Investigations and Intelligence ("BII") for review and approval. (Investigative Summary, Doc. 40-18 p. 14).

Special Investigator Tokach reviewed the investigation. (BII Closing Memo, Doc. 40-19). On August 18, 2020, the BII informed Superintendent Mason that it did not agree with Lieutenant Briscoe's conclusion that Plaintiff's allegations were unsubstantiated. (Defendants' SOF, Doc. 41 ¶ 24); (Plaintiff's Response, Doc. 50 ¶ 24) (admitting this was the conclusion reached but denying that it was a correct conclusion); (BII Closing Memo, Doc. 40-19). Rather, it determined the allegations were unfounded. (Defendants' SOF, Doc. 41 ¶ 24); (Plaintiff's Response, Doc. 50 ¶ 24) (admitting this was the conclusion reached but denying that it was a correct conclusion); (BII Closing Memo, Doc. 40-19).

### d.    Misconduct No. D 362281: Lying to an Employee

On August 20, 2020, Captain Dunkle issued Misconduct No. D 362281 charging Plaintiff with a B Class 1 offense of lying to an employee. (Defendants' SOF, Doc. 41 ¶¶ 37-39); (Plaintiff's Response, Doc. 50 ¶¶ 37-39) (admitting Doc. 41 ¶¶ 37-39); (Misconduct No. D 362281, Doc. 40-20, p. 1).[2] In the "staff members version," Captain Dunkle wrote that Plaintiff alleged "CO Smith stared into his cell (H/B12) while he was naked and stated 'if I had to walk around with a dick like that, I'd want to kill myself too,'" and noted that a PREA investigation was completed and BII submitted a closing memo indicating the allegation was unfounded. (Misconduct No. D 362281, Doc. 40-20 p. 1).

Per DOC Policy DC-ADM 801 § 1(B)(4) a misconduct charge "shall be investigated as required, reviewed, and approved by the Shift Commander, prior to service . . . on the inmate. (Defendants' SOF, Doc. 41 ¶ 41); (Plaintiff's Response, Doc. 50 ¶ 41) (admitting Doc. 41 ¶ 41); (DC-ADM 801, Doc. 40-22 p. 9). C/O Powell was the ranking Corrections Officer on duty that day. (Defendants' SOF, Doc. 41 ¶¶ 42-47); (Plaintiff's Response, Doc. 50 ¶¶ 42-47) (admitting that Powell was the shift commander that day). He reviewed Misconduct No. D 362281 and concluded that Captain Dunkle's version of events supported the charge of lying to an employee, that there were no errors, and that the dates were correct.

---

[2] The misconduct report was written by Captain Dunkle because Lieutenant Briscoe was on long term leave.

(Defendants' SOF, Doc. 41 ¶¶ 42-47); (Plaintiff's Response, Doc. 50 ¶¶ 42-47) (disputing Powell reviewed the misconduct but citing no evidence to support this position). C/O Powell found that the charged violation was appropriate. (Defendants' SOF, Doc. 41 ¶¶ 42-47); (Plaintiff's Response, Doc. 50 ¶¶ 42-47) (disputing Powell made any independent determination about the charges but citing no evidence to support this position). He also researched Plaintiff's mental health status and determined that the charges in Misconduct No. D 362281 were not appropriate for informal resolution. (Defendants' SOF, Doc. 41 ¶¶ 42-47); (Plaintiff's Response, Doc. 50 ¶¶ 42-47) (admitting this fact).

### e.    Hearing and Administrative Appeals of Misconduct No. D. 362281

On August 24, 2020, Hearing Examiner Wiederhold presided over Plaintiff's misconduct hearing. (Defendants' SOF, Doc. 41 ¶ 48); (Plaintiff's Response, Doc. 50 ¶ 48) (admitting this fact); (Disciplinary Hearing Report, Doc. 40-24 p. 1). Plaintiff pleaded not guilty and provided written and oral statements in his defense. Plaintiff argued that the misconduct was issued in retaliation for filing a PREA complaint against C/O Smith and denied that he lied. (Disciplinary Hearing Report, Doc. 40-24 p. 1). In his written statement, Plaintiff asserted that:

1) The word 'unfounded' does not mean that I lied about anything. The word 'unfounded' just means not supported. In other words, I need more than just my word against the c/o's for the PREA complaint to go forward. Simply because more proof is necessary does not mean that I am lying. It only means that Lt.

Briscoe (c/o Smith's buddy) chose to take c/o Smith's word over mine.

2)  The proof that I offer is camera footage. While it is true that the camera does not record audio; it is true that the footage will verify that c/o Smith was at the cell door twice (between the hours of (9:15AM. And 13:45 PM.). The camera would have also recorded his mouth moving, his facial expressions, and hand gestures while he stood in front of the POC. cell.

3)  Most importantly, issuing a misconduct because of the filing of a PREA complaint violates the PREA directive; because I am being punished (retaliated against) for the filing of a PREA complaint. This is strictly forbidden by the PREA directives. See: DC-ADM-008. There is also a federal PREA mandated that is violated when the PREA victim is retaliated against.

(Inmate's Version, Doc. 40-24).

Hearing Examiner Wiederhold reviewed the Investigatory Summary Report concluding that Plaintiff's allegations were "unsubstantiated," reviewed the BII closing memo, and determined that the witness statements in the Investigatory Summary that C/O Smith said nothing derogatory to Plaintiff was more credible than Plaintiff's testimony that he did not lie. (Defendants' SOF, Doc. 41 ¶ 49); (Plaintiff's Response, Doc. 50 ¶ 49) (admitting that this was the result, but disputing the decision was fair without citing to any evidence); (Disciplinary Hearing Report, Doc. 40-24 pp. 1-2). He concluded that a preponderance of the evidence supported the charge, and sentenced Plaintiff to 30 days of DC. (Defendants' SOF, Doc. 41 ¶ 49); (Plaintiff's Response, Doc. 50 ¶ 49) (admitting

that this was the result, but disputing the decision was fair without citing to any evidence); (Disciplinary Hearing Report, Doc. 40-24 pp. 1-2).

Plaintiff appealed the misconduct charge, but it was upheld at every level. (Defendants' SOF, Doc. 41 ¶ 50); (Plaintiff's Response, Doc. 50 ¶ 50) (admitting this fact).

### 2. Retaliatory Harassment by C/O Smith

Plaintiff alleges that C/O Smith verbally harassed him to retaliate against Plaintiff for accusing Smith of sexual harassment.

Plaintiff describes a combination of verbal and non-verbal harassment in two grievances: (1) an unnumbered grievance construed as the appeal of Grievance No. 827182 (Plaintiff's PREA Complaint), filed on June 19, 2020, (Unnumbered Grievance, Doc. 40-4 pp. 5-6); and (2) Grievance No. 878355, dated July 13, 2020, (Grievance No. 878355, Doc. 40-6 p. 2). Plaintiff mentions non-verbal harassment by way of a "death stare" in Grievance No. 899121, filed on November 10, 2020, (Doc. 40-26). Plaintiff's claims in his Amended Complaint, are limited to verbal harassment. He does not allege a claim that C/O Smith retaliated against him by way of "death stare." We will nonetheless summarize all three grievances, as the "death stare" could be considered as part of a pattern of antagonism.

### a.    Grievance No. 827182 (Describing Retaliatory Verbal Harassment and Retaliatory Death Stare)

On June 9, 2020, Grievance No. 827182 was rejected and forwarded to the Security Office for Investigation. (Grievance No. 872182 Rejection, Doc. 40-4 p. 4). Ten days later, on June 19, 2020, Plaintiff submitted a written inmate grievance to the facility grievance coordinator "in regard[] to grievance number 872182." (Unnumbered Grievance, Doc. 40-4 p. 5). In that document, Plaintiff alleged that on June 19, 2020, C/O Smith noticed Plaintiff walking towards the dining hall and said "Yo [Plaintiff] keep f[***]ing walking a[**]hole." *Id.* Then, as Plaintiff exited the dining hall, C/O Smith looked at Plaintiff in a "vicious and intimidating manner." *Id.* This document was treated as an appeal of Grievance No. 827182, and the rejection of that grievance was upheld by the facility manager on July 6, 2020. (Facility Manager's Appeal Response, Doc. 40-4 p. 7). Plaintiff raised the same concerns in his final appeal of Grievance No. 872182. (Inmate Appeal to Final Review, Doc. 40-4 p. 8) ("I then filed a second grievance for retaliation because on 6.19.20 C/O Smith left his post inside of the dining hall three, came outside as he noticed me walking past and said to me "yo . . . keep f[***]ing walking a[**]hole."). On August 25, 2020, the Chief Grievance Officer determined that Grievance No. 872182 was properly rejected. (Final Appeal Decision Dismissal, Doc. 40-4 p. 1). Plaintiff's allegations related to the June 19, 2020 incident were not discussed in the PREA investigative summary.

## b.    Grievance    No.    878355    (Describing    Verbal Harassment and Vicious Staring)

On July 13, 2020, Plaintiff filed Grievance No. 878355 alleging that on July 11, 2020, C/O Smith "viciously stared" at him and stated, "only p[***]ys file grievances," then turned to another inmate and said, "I have some money for you to take care of a p[***]y ni[**]a for me." (Grievance No. 878355, Doc. 40-6 p. 2); (Defendants' SOF, Doc. 41 ¶ 60); (Plaintiff's Response, Doc. 50 ¶ 60) (admitting this fact).

On July 24, 2020, the facility grievance coordinator denied the grievance, and responded that:

> I have reviewed your grievance dated 7/13/2020, where in you indicate Officer Smith viciously starred at you and stated "only p[***]ys file grievances" and offered another inmate money to "take care of a p[***]y nigga for me" as you exited the Yard on July 11th.

> I interviewed Officer Smith regarding these allegations, and he denied making these threatening statements. His job is to monitor inmate activity/movement during recreational periods. Furthermore, I'm not sure how you perceived him to be "viciously starring [sic] at you with the look of death" since he was wearing sunglasses.

> Based on my investigation, I find no evidence to support your claim of harassment or intimidation.

> Based on the above information, I consider this grievance to be without merit with no further action necessary. The relief and compensation you seek is denied.

(Grievance No. 878355 Initial Review Response, Doc. 40-6 p. 3).

On July 28, 2020, Plaintiff appealed Grievance No. 878355 to the facility manager. (Grievance No. 878355 Appeal to Facility Manager, Doc. 40-6 p. 4). He repeated the same allegations regarding C/O Smith's conduct. *Id.*

On August 21, 2020, the facility manager upheld the grievance coordinator's response. (Grievance No. 878355  Facility Manager Appeal Response, Doc. 40-6 p. 5). The facility manager explained:

> Upon review of all information, I find that [the facility grievance coordinator] properly investigated your claims and provided you with an appropriate response. Officer Smith denies all allegations made and there is no evidence to substantiate your claims.

*Id.* Plaintiff claims on August 31, 2020, he received the response. (Grievance No. 878355 Final Appeal, Doc. 40-6 p. 6).

On September 11, 2020, Plaintiff filed a final appeal of Grievance No. 878355. *Id.* On November 3, 2020, the chief grievance officer upheld the facility manager's response. (Grievance No. 878355 Final Appeal Response, Doc. 40-6 p. 1). The chief grievance officer explained:

> This office finds the responses provided to you appropriately addressed your concerns. Despite your claims, records reflect that no evidence was found to suggest that Officer Smith made the comments you indicate he did. Records reflect that Officer Smith was interviewed and denied viciously starring [sic] at you or making such comments. You provide no further information to support your claims either. Therefore, this office upholds the responses provided to you and your requested relief is denied.

*Id.*

c.    **Grievance No. 899121 (Describing Retaliatory Death Stare)**

On November 10, 2020, Plaintiff filed Grievance No. 899121 alleging that on November 8, 2020, C/O Smith viciously stared at him. (Grievance No. 899121, Doc. 40-26 p. 10). Plaintiff wrote:

> On November 8, 2020, while returning from my visit, visit ending at 2:45pm, [C/O Smith] viciously starred [sic] at me so much that if looks could kill I'd be dead. Clearly and obviously in retaliation to grievances 872182 and 878355 [C/O Smith] continues to harass and officially oppress me to prove that he is above SCI-Mahanoy. I continuously express my fear for retaliation from C/O Smith and I also fear for my safety knowing he is around.

*Id.*

On November 16, 2020, the facility grievance coordinator rejected Grievance No. 899121. She explained that Plaintiff did not "indicate that [he] was personally affected by a department or facility action or policy." (Grievance No. 899121 Rejection, Doc. 40-26 p. 9). Nothing in the summary judgment record suggests Plaintiff appealed the rejection or refiled the grievance. (Grievance Summary History, Doc. 40-3 p. 1) (noting the "status" of this Grievance as "1st rejection"). In his Amended Complaint, Plaintiff does not allege any retaliation claim related to the death stare. (*See generally* Doc. 19).

### 3.    Rule Violation Charge No. D 074825

Plaintiff alleges that C/O Smith issued a false report accusing Plaintiff of misconduct to punish Plaintiff for accusing Smith of sexual harassment. (Amended Complaint, Doc. 19 ¶ 41).

The summary judgment record includes one DC-141 form by C/O Smith issued to Plaintiff on August 15, 2021. (DC-141 Part 1 D 074825, Doc. 49-2). That form, assigned Number D 074825, charges Plaintiff with using abusive or inappropriate language, refusing to obey an order, and being present in an unauthorized area. *Id*. The box for "misconduct report" is not checked, and instead it is marked "DC-ADM 801 Informal Resolution." *Id*.[3] The charges are identified as a class one misconduct. *Id*. C/O Smith provided the following account:

> On the above date and approx. time, this reporting officer observed [Plaintiff] walk into the BB laundry room. [Plaintiff] is not an authorized laundry worker. I gave [Plaintiff] a direct order to leave the laundry room, which he disregarded. I again gave him a direct order to remove himself from the laundry room, which he did this time at his leisure. I then asked him if he had authorization to be in the laundry room, but he ignored me. I once against asked him if he was authorized to be in the laundry room. [Plaintiff] finally responded, "I don't have to answer a F[***]ing thing you ask me; I'll do whatever I want." He then continued to stand at the laundry room door before returning back to his cell.

*Id*. The report was reviewed and approved by Lieutenant White. *Id*.

---

[3] DC-ADM 801 provides that "[e]very rule violation is to be reported via a **DC-141, Part 1, Misconduct Report**, and that each violation of the rules "shall be reported and disposed of either by an informal or formal process." (DC-ADM 801 §1(A)(1) and (B), Doc. 40-22, pp. 8-9).

This rule violation was recommended for, and resolved through, the informal resolution process. *Id*.[4] Documents related to that process were not made part of the summary judgment record.

## III.    LEGAL STANDARD

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56(a) provides that a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] The materiality of the facts

---

[4] On August 17, 2021, Plaintiff filed written Grievance No. 941230 with the facility grievance coordinator. In Grievance No. 941230, Plaintiff wrote:

> On the morning of August 15, 2021, [C/O Smith] yelled at me stating "yo D[**]khead are you authorized to be over there" I ignored [C/O Smith] and he then stated, "D[**]head . . . I am talking to you" I continued to ignore [C/O Smith], receive my bottle of disinfect and proceed to my cell. Camera footage at approx. 7:45am will prove the above stated facts. This is clearly in retaliation to grievance(s) 872182 and 878355. Furthermore, [C/O Smith] lacks training, he's unfit to work on an RHU and as a result of his statements I've experienced a high level of paranoia and anxiety and as previously expressed I fear for my life and safety when [C/O Smith] is present. I am seeking a separation by way of transfer and $25,000 in actual compensation for the continuous harassment, retaliation and future legal fees.

(Grievance No. 941230, Doc. 49-3).

The summary judgment record does not include any written response from the facility grievance coordinator. A grievance chart Defendants provided suggests that Grievance No. 941230 was withdrawn. (Grievance Summary History, Doc. 40-3, p. 1). Plaintiff's allegations in the Amended Complaint regarding this incident are limited to issuing a misconduct. (Amended Complaint, Doc. 19, ¶ 41).

[5] Fed. R. Civ. P. 56(a).

depends on the substantive law for each claim at issue.[6]  Only "facts that might affect the outcome of the suit under governing law" are material such that a dispute will preclude the entry of summary judgment.[7]  A dispute over a material fact is genuine only if the evidence is such that a reasonable jury could find in favor of the nonmoving party.[8] !

The movant bears the initial responsibility to "demonstrate the absence of a genuine issue of material fact," relying on pleadings, depositions, affidavits, and other evidence in the record.[9]  If the dispositive issue is one on which the non-movant will bear the burden of persuasion at trial, the movant can meet their initial responsibility in one of two ways: (1) submitting affirmative evidence that negates an essential element of the non-movant's claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the non-movant's claim.[10]

If the movant "successfully points to evidence of all of the facts needed to decide the case on the law," the non-movant can still defeat summary judgment by pointing to evidence in the record which creates a genuine dispute of material fact

---

[6] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[7] *Id.*

[8] *Id.*

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[10] *Id.* at 331 (Brennan, J., dissenting); *see also Finley v. Pennsylvania Dep't. of Corrections*, No. 3:12-CV-2194, 2015 WL 1967262, at *9 n.1 (M.D. Pa. Apr. 30, 2015).

and from which a jury could find in his favor.[11] However, if the non-movant "evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[12] A court may not make credibility determinations or weigh the evidence, but "must view the facts in the light most favorable to the non-moving party."[13] At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[14]

Furthermore, a court may also grant summary judgment *sua sponte*, if the opposing party is given notice and an opportunity to respond.[15]

## IV.    DISCUSSION

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or

---

[11] *El v. Southeastern Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007).

[12] *Anderson*, 477 U.S. at 249-50 (citations omitted).

[13] *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[14] *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (A court may not weigh the evidence or make credibility determinations).

[15] Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."); *Celotex*, 477 U.S. at 326 ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [he] had to come forward with all of her evidence.").

immunities secured by the Constitution or laws of the United States."[16] "It is well settled that § 1983 does not confer any substantive rights, but merely 'provides a method for vindicating federal rights elsewhere conferred.'"[17] To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) a deprivation of a federally protected right; and (2) this deprivation was committed by a person acting under color of state law.[18]

Plaintiff alleges that C/O Smith violated Plaintiff's First Amendment rights by retaliating against Plaintiff after Plaintiff field a PREA complaint against C/O Smith. Plaintiff must prove the following three elements to prevail on each claim: (1) he engaged in constitutionally protected conduct; (2) adverse action by prison officials sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights was taken against him; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him.[19]

If the inmate shows these first three elements, the burden then shifts to Defendants to "establish that the same decision would have been made even absent any retaliatory motive."[20]

---

[16] *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

[17] *Williams v. Pa. Hum. Rels. Comm'n*, 870 F.3d 294, 297 (3d Cir. 2017) (quoting *Hildebrand v. Allegheny Cnty.*, 757 F.3d 99, 104 (3d Cir. 2014)).

[18] *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

[19] *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003).

[20] *Watson v. Rozum*, 834 F.3d 417, 426 (3d Cir. 2016).

### A.    PLAINTIFF'S RETALIATORY VERBAL HARASSMENT CLAIM AGAINST C/O SMITH

Plaintiff alleges that, after he filed a PREA complaint against C/O Smith alleging sexual harassment, C/O Smith began to verbally harass Plaintiff. (Doc. 19 ¶¶ 20, 22, 35). The verbal statements at issue include:

(1) "Yo [Plaintiff] keep f[***]ing walking a[**]hole." (Unnumbered Grievance dated June 19, 2020, Doc. 40-4 p. 5).

(2) "only p[***]ys file grievances," then turned to another (unidentified) inmate and said, "I have some money for you to take care of a p[***]y ni[**]a for me." (Grievance No. 878355 dated July 11, 2020, Doc. 40-6 p. 2).[21]

In our memorandum opinion addressing Defendants' motion for summary judgment, we noted that it appeared the verbal harassment and threats at issue did not satisfy the "adverse action" element of Plaintiff's retaliatory verbal harassment claim and invited the parties to brief the issue.

---

[21] In his grievance, Plaintiff wrote:

As a form of retaliation, intimidation and official oppression for the filing of grievance 872182, camera footage will show me exiting yard two on 7.11.20, ignoring C/O Smith as he viciously starred at me with the look of death and stated to me "only p[***]ys file grievances." C/O Smith then said to an inmate walking in front of me whose name is unknown to me "I have some money for you to take care of a p[***]y nigga for me, with a grin and a smirk on his face all while directing his eyes and body language towards me. C/O Smith is not only a white thug employed by the D.O.C. But to direct a racial slur towards in an attempt to intimidate, antagonize and harm me shows exactly the type of individual he is and exactly how far he is willing to go to accomplish silencing this whistleblower.

(Doc. 40-6, p. 2).

Plaintiff argues that the verbal harassment and threats satisfy the second element of his retaliation claim. To support this position, he cites to a series of cases involving incidents that occurred outside the prison setting. He also cites to two cases that involve verbal harassment and threats made by a guard to an inmate in the institutional setting—*Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (finding that an inmate-plaintiff satisfied the requirement of showing adverse action by producing evidence that the defendant "denied [the inmate-plaintiff's] interview request and noted on the denial that [the inmate-plaintiff] should be 'careful' what he writes and requests in his administrative grievances," and then the same official requested that the inmate-plaintiff be transferred out of the facility due to his filing of grievances and a lawsuit) and *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994) (finding that an inmate-plaintiff satisfied the adverse action requirement where he submitted evidence that a corrections officer threatened to retaliate against him if he did not drop an internal prison grievance complaining about a use of force).

In response, C/O Smith argues that the Third Circuit has held that verbal harassment, and vague, isolated verbal threats do not satisfy the adverse action element. The rely on several Third Circuit decisions to support their argument, including: *Chruby v. Kowalesky*, 534 F. App'x 156, 161 (3d Cir. 2013) (finding that a verbal threat to write an inmate-plaintiff up for misconduct if he wrote

another letter that the defendant deemed inappropriate was not sufficient to deter a reasonable inmate from exercising his constitutional rights); *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012); *Burgos v. Canino*, 358 F. App'x 302, 306 (3d Cir. 2009) (finding that a threat to charge an inmate-plaintiff with misconduct for failing to submit to a urinalysis test which the inmate-plaintiff believed was required in retaliation for filing grievances was not an adverse action); and *Booth v. King*, 228 F. App'x 167 (3d Cir. 2007) (finding, in the context of an Eighth Amendment claim, that "absent any allegation of physical harm, the defendants' verbal threats do not amount to a constitutional violation.").

To prevail on a retaliation claim, the adverse action at issue must be sufficient to deter an inmate of ordinary firmness from exercising his rights, or in this case from continuing to seek redress through the grievance system. Thus, Plaintiff must show that he was threatened or harassed, and that the threat or harassment would have deterred an inmate of ordinary firmness from exercising his rights.[22] When deciding at summary judgment whether there is a triable issue of fact as to whether the verbal harassment or verbal threats amount to adverse action, Courts look to the specificity and circumstances under which the verbal threats or verbal harassment were given. Courts have also acknowledged that prisoners may

---

[22] *Dunbar v. Barone*, 487 F. App'x 721, 722-23 (3d Cir. 2012) ("we note that Dunbar also had to show that the Defendants' actions were sufficiently adverse to deter a person of ordinary firmness from engaging in the protected activity in order to prevail on the retaliation claim.").

be required to tolerate more than average citizens before a retaliatory action taken against them is considered adverse.[23] For example, in *Dunbar v. Barone*, an inmate alleged that corrections officers harassed him for corresponding with civil rights organizations by making verbal threats that the inmate was a "marked man" and that his "days were numbered."[24] Additionally, corrections officers harassed the inmate by putting pillowcases over their heads to mimic the Ku Klux Klan, made gestures similar to the Nazi salute and posted an offensive picture on Plaintiff's cell door.[25] The Third Circuit held that "the verbal threats and few gestures of racial harassment Dunbar allegedly encountered are not sufficiently adverse to support a retaliation claim under the circumstances of this case."[26]

Here, Plaintiff claims that C/O Smith referred to him using racial and other slurs on two occasions, and on one of those two occasions also directed a comment to an unidentified inmate suggesting he would pay money to have Plaintiff "taken care of." The verbal threat and harassment are like the harassment and threats that

---

[23] *Mateo v. Fischer*, 682 F. Supp. 2d 423 (S.D.N.Y. 2010).

[24] *Dunbar*, 487 F. App'x at 722-23; *see also Mateo*, 682 F. Supp. 2d at 424 (observing that the issue of whether a verbal threat amounts to adverse action may depend on the specificity of the threat and the context in which it is uttered, and collective cases); *Zielinski v. Annucci*, 547 F. Supp. 3d 227, 233 (N.D.N.Y. 2021) (observing that hostile statements of prison guards, through made in connection with an inmate's exercise of free speech, do not presumptively violate the First Amendment, but may rise to the level of adverse actions if they are either quite specific or made on a repeated basis).

[25] *Dunbar*, 487 F. App'x at 733-23.

[26] *Id.*

the Third Circuit found insufficient in *Dunbar* and are less significant than threats other courts have found insufficient.[27] Further, to be a true deterrent, an inmate of reasonable firmness must have believed both C/O Smith's vague offer of "some money" to "take care of" Plaintiff, and that this unidentified inmate would accept C/O Smith's "offer." Plaintiff did not provide any evidence that suggests how the unidentified inmate reacted to C/O Smith's comment. While not dispositive of this issue, we observe that Plaintiff himself was not deterred. He continued to pursue his PREA complaint and continued to utilize the grievance system for other matters (including filing grievances against C/O Smith himself). Thus, in the absence of any evidence from which a factfinder could reasonably infer this verbal harassment and one-time threatening comment would deter an inmate of ordinary firmness from continuing to use the prison grievance system, C/O Smith's verbal harassment and verbal threats are not as a matter of law adverse actions.

Accordingly, we will grant summary judgment because Plaintiff has not produced sufficient evidence from which a reasonable factfinder could conclude the verbal harassment or "threat" was sufficient to a deter an inmate of ordinary firmness from continuing to utilize the prison grievance system.

---

[27] *Dunbar*, 487 F. App'x at 722-23; *Mateo*, 682 F. Supp. 2d at 424.

## B.    PLAINTIFF'S RETALIATORY DISCIPLINE CLAIM

Plaintiff alleges that C/O Smith retaliated against him for filing his June 6, 2020 PREA complaint (which was determined to be unfounded on or around August 18, 2020) when he charged Plaintiff with violating a prison rule on August 15, 2021.

In our memorandum opinion addressing Defendants' motion for summary judgment, we noted that it appeared that there was insufficient evidence to support a causal connection between the PREA complaint and August 2021 rule violation and invited the parties to brief the issue.

As we explained in our prior order, to establish the requisite causal link an inmate must prove that his constitutionally protected conduct was a substantial or motivating factor for the retaliatory action.[28] To do so, an inmate usually must prove either: (1) there was an unusually suggestive temporal proximity between the protected activity and the adverse action; or (2) a pattern of antagonism coupled with timing.[29] If neither of these showings can be made, the claim may still proceed if a plaintiff produces evidence from which a causal connection can be inferred.[30]

---

[28] *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).
[29] *DeFranco v. Wolfe*, 387 F.App'x 147, 154 (3d Cir. 2010) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).
[30] *Id.*

In his objection, Plaintiff argues that a factfinder could infer a causal connection from the circumstances as a whole because C/O Smith antagonized Plaintiff every time they encountered one-another, even though their encounters were only sporadic. (Doc. 59, pp. 3-4). In response, C/O Smith argues that Plaintiff has failed to produce evidence that they only crossed paths four times over the course of a year, or that every encounter they had between the PREA complaint and filing this lawsuit was hostile. (Doc. 61, p. 4).

We agree with C/O Smith that the evidence related to the three allegedly antagonistic encounters (on June 19, 2020, July 11, 2020, and November 10, 2020) between the date the PREA complaint was filed (on or around June 6, 2020) and the date of the rule violation charge (August 15, 2021) is not sufficient to create a triable issue of fact for the jury on the issue of a causal link.

To establish a causal link based on timing alone, the alleged retaliatory action must be unusually suggestive of retaliatory motive.[31] The amount of time is usually measured in weeks or months.[32] In the employment discrimination context, periods of as little as seventeen days have been found insufficient to establish

---

[31] *Singleton v. Shearer*, No. 1:17-CV-1027, 2019 WL 3337060, at *6 (M.D. Pa. July 25, 2019) ("When showing causation through unusually suggestive timing, the contemplated temporal proximity must be 'on the order of days or weeks.'") (quoting *Rink v. Northeastern Educ. Intermediate Unit*, 717 F. App'x 126, 134 (3d Cir. 2017)).

[32] *Id.*

causation based on timing alone.[33] These same requirements have been applied to analyze retaliation claims outside the employment context, including cases where an inmate alleges he was retaliated against by a member of the prison staff.

The passage of time, however, is not legally conclusive. Courts have found causation exists where the person accused of retaliation engaged in a pattern of antagonistic behavior that links the protected activity and retaliatory action. In the absence of unusually suggestive timing, or a pattern of antagonism coupled with timing to link the events, an inmate may point to other evidence from the record as a whole from which causation can be inferred.

The summary judgment record documents that Plaintiff complained of verbal and other harassment by C/O Smith in June 2020, July 2020, November 2020, and later learned that in September 2020 C/O Smith offered an inmate an extra food tray and a single cell to harass Plaintiff. (Docs. 40-4, 40-6, 40-26, and 49-4). There is at least a dispute as to whether C/O Smith engaged in a pattern of antagonism. Coupled with timing, however, this pattern is not sufficient to infer causation. The purported antagonism documented in this record ended in November 2020. Thus, even viewed as a pattern, the antagonism ended nine months before the rule violation charge was issued. This nine-month gap

---

[33] *See, e.g.*, *Jamison v. Wetzel*, No. 1:13-CV-2129, 2023 WL 791444, at *13 (M.D. Pa. Feb, 25, 2015).

effectively breaks the link between that pattern and the August 2021 rule violation charge.

The record viewed also does not contain sufficient evidence from which a reasonable factfinder could infer there is a connection between the August 2021 rule violation and the June 2020 PREA complaint. In August 2021, C/O Smith charged Plaintiff with using inappropriate language, refusing to obey an order, and being in the laundry room without permission. Plaintiff has not adduced sufficient evidence linking these infractions with his PREA complaint. Thus, nothing more that speculation links these two events.

Accordingly, we conclude that summary judgment is appropriate as to Plaintiff's retaliatory discipline claim against C/O Smith.

### C.    PLAINTIFF'S REQUEST TO RECONSIDER THE DECISION GRANTING SUMMARY JUDGMENT AS TO THE RETALIATION CLAIM AGAINST HEARING OFFICER WIEDERHOLD

In his objections, Plaintiff raises a third issue. He argues that Court erred in its prior memorandum opinion when it granted summary judgment in Defendants' favor for Plaintiff's claim of retaliatory discipline against Hearing Officer Wiederhold. Regarding this claim, Plaintiff relies on largely the same argument— that Hearing Officer Wiederhold reached the incorrect conclusion during a disciplinary hearing. *Compare* (Doc. 59, pp. 7-9) *with* (Doc. 49, pp. 2-10).

In response, Defendants argue that, assuming Plaintiff intended this argument to serve as a motion to reconsider, it should be denied because Plaintiff is attempting to re-litigate and re-argue issues already decided by the Court. (Doc. 61, pp. 5-7).

The legal standards that govern motions to reconsider are both clear, and clearly compelling. "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence."[34] Typically, such a motion should only be granted in three, narrowly defined circumstances, where there is either: "(1) [an] intervening change in controlling law, (2) availability of new evidence not previously available, or (3) need to correct a clear error of law or prevent manifest injustice."[35] As the United States Court of Appeals for the Third Circuit has aptly observed:

> "The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café*, 176 F.3d at 677 (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985)). "Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Id.* (citation omitted).[36]

---

[34] *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985).

[35] *Dodge v. Susquehanna Univ.*, 796 F.Supp. 829, 830 (M.D. Pa. 1992).

[36] *Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.*, 602 F.3d 237, 251 (3d Cir. 2010).

Thus, it is well-settled that a mere disagreement with the court does not translate into the type of clear error of law which justifies reconsideration of a ruling.[37] Furthermore, "[b]ecause federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly."[38] Moreover, it is evident that a motion for reconsideration is not a tool to re-litigate and reargue issues which have already been considered and disposed of by the court.[39] Rather, such a motion is appropriate only where the court has misunderstood a party or where there has been a significant change in law or facts since the court originally ruled on that issue.[40]

In his request for reconsideration, Plaintiff does not cite to any intervening change in the law or new facts. Instead, he attempts to relitigate his argument that Hearing Officer Wiederhold's decision sanctioning Plaintiff for "lying" is incorrect. In his brief, Plaintiff argues that "there is no preponderance of evidence to support a finding that plaintiff lied." (Doc. 59, p. 12). Plaintiff argues that Hearing Officer Wiederhold could not have reached a conclusion based on a preponderance of the evidence because exactly half of the evidence was favorable to Plaintiff, and the other half was not. He argues that because there was a "stale

---

[37] *Dodge*, 796 F.Supp. at 830.

[38] *Continental Casualty Co. v. Diversified Indus., Inc.*, 884 F.Supp. 937, 943 (E.D. Pa. 1995).

[39] *Dodge*, 796 F.Supp. at 830.

[40] *See Above the Belt, Inc. v. Mel Bohannon Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983).

mate" Hearing Officer Wiederhold could not have reached any conclusion by a preponderance of the evidence. (Doc. 59, p. 8).

Plaintiff's argument, however, fails. Plaintiff does not argue that there has been an intervening change in the controlling law or that there is a need to correct a clear error of law to prevent manifest injustice, and in fact does not cite to any caselaw to support his argument. He appears to agree with the legal standard this Court applied, he simply disagrees with the Court's analysis. Plaintiff does not argue or provide new evidence. We will decline Plaintiff's invitation to rehash an argument that he has already raised, and we have already decided. Accordingly, to the extent Plaintiff seeks reconsideration, his request will be denied.

### D.    PLAINTIFF'S REMAINING REQUESTS IN HIS OBJECTIONS

In his objection, Plaintiff also requests that the Court appoint Plaintiff an attorney to represent him and order an evidentiary hearing. These requests will be denied as moot because we have granted summary judgment in Defendants' favor as to all of Plaintiff's remaining claims.

## V.    CONCLUSION

Accordingly, for the reasons explained herein, we conclude that:

(1)    Summary judgment will be granted in Defendants' favor as to the two remaining retaliation claims against C/O Smith.

(2)    Plaintiff's request for reconsideration of the Court's decision to grant summary judgment in Defendants' favor as to the retaliation claim against Hearing Examiner Wiederhold will be denied.

(3)    Plaintiff's requests for appointment of counsel and an evidentiary hearing will be denied as moot.

(4)    This case will be closed.

(5)    An appropriate order will be issued.

Date: June 6, 2025                    BY THE COURT

                                     *s/William I. Arbuckle*
                                     William I. Arbuckle
                                     U.S. Magistrate Judge